**RECEIVED**
KG
8/4/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

BC/CAT2/ RANDOM

**FILED**
8/13/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**24-CV-06882**

| | |
|---|---|
| KENTON GIRARD, | |
| MARISSA GIRARD, | |
| MINOR CHILD GW, and | |
| MINOR CHILD GR, | |
| | Case No. 1:24-cv-_____ |
| Plaintiffs, | |
| | **District Judge** JUDGE PALLMEYER |
| v. | MAGISTRATE JUDGE APPENTEN |
| | **Magistrate** _____ |
| VILLAGE OF GLENCOE, ILLINOIS, | |
| DETECTIVE RYAN MCENERNEY, | **Complaint** and |
| MARIA PAREDES, | |
| VANESSA HAMMER, | **Jury Demand** |
| HAMMER SERNA & QUINN LLC, | |
| GWENN WALDMAN, | *featuring civil rights, RICO causes* |
| BREANNA TRAUB, | |
| PHYLLIS AMABILE MD, | |
| BEERMANN LLP, | |
| JOHN M. D'ARCO ESQ, | |
| JAMES M. QUIGLEY ESQ, | |
| ENRICO J. MIRABELLI ESQ, | |
| JUDGE WILLIAM S. BOYD, | |
| JUDGE RENEE G. GOLDFARB, and | |
| KATHRYN CIESLA ESQ, | |
| | |
| Defendants. | |

Plaintiffs pro se Kenton Girard, Marissa Girard and on behalf of their minor children Gw. and Gr. for their Complaint against Defendants **hereby request a trial by jury** pursuant to FRCP 38(b) and allege as follows:

**PRELIMINARY STATEMENT**

1.      A custody agreement was approved and entered between Kenton Girard and his ex-wife Jane Girard as to the minor children Gw. and Gr. on November 4 2015. The equilibrium

under this agreement was violently disrupted however when, upon information and belief, Jane Girard started sexually abusing her now estranged minor children Gw. and Gr. on or around June 2021.

      2.      Upon information and belief, as a direct result of those penetrative sexual assaults, the minor children Gw. and Gr. no longer tolerated spending any time residing at the residence of Jane Girard at 90 Linden Ave in Glencoe and since 2022 have been residing full-time at their father's home at 965 Forestway Drive in Glencoe.

      3.      With the minor children estranged, Jane Girard turned to Beermann LLP to incept a new family law pleading against her ex-husband Plaintiff Kenton Girard with the stated purpose of acquiring full custody of her estranged minor children.

      4.      In turn, Kenton Girard and his wife Marissa Girard and the minor children Gw. and Gr. fell victim in what, upon information and belief, amounts to a long and growing chain of Beermann LLP counterparties to be financially bled out by rigged and highly abusive judicial proceedings resulting from years of bribery of Cook County family law judges.

      5.      Beermann LLP has in recent years acquired a reputation as a truly unbeatable foe in the family law courts, owing to its track record of manipulated results before judges it has upon information and belief bribed in exchange for a never-ending flow of favorable rulings. This outrageous scheme has been largely quarterbacked by managing partner John M. D'Arco, son of the infamous former Illinois legislator John A. D'Arco[1] who was convicted under consecutive indictments in the Northern District of Illinois in the early 1990s for bribery.

---

[1] According to Wikipedia (John D'Arco Sr. - Wikipedia), John D'Arco Sr had also previously served in the role of First Ward Alderman in which capacity he allegedly advocated for the economic interests of the Chicago Outfit. During the 1970s, D'Arco was investigated by the US federal government for his alleged involvement in an attempt to fix the 1977 murder trial of reputed hitman Harry Aleman, but he was never indicted.

6.    The scope of the racketeering goes beyond the mere bribing of the family law judges. Upon information and belief, Beermann LLP does not hesitate to barter its power to suggest and appoint legal functionaries (child coordinators, custodial evaluators, parental evaluators, child therapists, family reunification therapists, guardians ad litem, and so forth) in exchange for kickbacks and favorable rulings for its clients – padding its legal fees all the while.

7.    In other instances, Beermann LLP does not hesitate to direct personnel outside of the proceedings to undertake extra-judicial maneuvering. For example, upon information and belief, Beermann LLP directed outside counsel Kathryn Ciesla Esq from Northfield to deliver some form of illicit consideration (possibly a cash payment) to Village of Glencoe Detective Ryan McEnerney – on his way home from work in nearby Glencoe on or around early August 2023 – in exchange for his written finding that felony child sex assault charges against Jane Girard were "unfounded".

8.    At that moment, Jane had been formally accused by both of her estranged minor daughters of penetrative sexual assault against each of them, as memorialized in both Glencoe police reports and a DCFS dossier, laying such a compelling and morally reprehensible evidentiary foundation that DCFS representative Chundra Brown in a visit to Plaintiffs' home actually stated that felony charges were forthcoming on or around July 2023.

9.    Upon information and belief, not only is Detective McEnerney a compromised and corrupted law enforcement officer, but he has been largely responsible for perpetuating an unofficial yet pervasive policy of the Village of Glencoe to not properly investigate rapes and sexual assault crimes against women and girls during the period in which Detective McEnerney has been the lead detective and/or guiding its investigative operations for the Village of Glencoe at least since on or around 2019.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law. This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) to redress deprivations "under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States."

11.     The Court has authority to grant injunctive relief pursuant to 42 U.S.C. § 1983 and the Court's inherent equitable powers.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants work and reside in this district. Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this district.

13.     Venue is further proper in this district as to those claims which do not specifically raise federal and constitutional questions under 28 U.S.C. §1367(a).

## PARTIES

14.     **Plaintiff Kenton Girard** (herein, "Girard") is a longtime resident of Glencoe and the ex-husband of Jane Girard, his counterparty in family law proceedings in which she is represented by Beermann LLP. Kenton also brings this action also on behalf of his minor children (and co-plaintiffs) Gw. and Gr.

15.     **Plaintiff Marissa Girard** is the wife for the last nine years of Kenton Girard and has played a substantial role in the parenting of Gw. and Gr. especially during the recent two years during which she and Kenton have had full custody of the minor children.

16.     **Defendant Village of Glencoe** is a municipality in the north shore with about 8,000 residents and located wholly within Cook County, Illinois.

17.     **Defendant Detective Ryan McEnerney** works for the department of public safety of the Village of Glencoe as the senior detective of the department with the responsibility for directing investigations and when warranted thereunder subsequently requesting the filing of criminal charges by the States Attorney's Office.

18.     **Defendant Maria Paredes** works for DCFS, the state agency tasked in large part with addressing the safety of children in the State of Illinois, especially pertaining to cases of abuse and neglect. At all times she acted in a supervisory capacity over the case involving the minor children Gw. and Gr. and she is being sued in her personal capacity.

19.     **Defendant Vanessa Hammer** was the Guardian ad Litem appointed in the family law proceeding incepted by Jane Girard in 2022, ultimately succeeded by a child representative after she withdrew thereunder .

20.     **Defendant HAMMER SERNA & QUINN LLC** is Vanessa Hammer's employer and is named hereunder under the doctrine of *respondeat superior*.

21.     **Defendant Gwenn Waldman** is a therapist from Breakthrough Family Solutions appointed to working with both of the minor children Gw. and Gr.

22.     **Defendant Breanna Traub** is a clinical social worker and therapist appointed to working with minor child Gw.

23.     **Defendant Phyllis Amabile MD** is a doctor who served as 604(b) evaluator for the family law proceedings initiated by Jane Girard on or around 2022.

24.     **Defendant Beermann LLP** (herein, "Beermann") is a disreputable family law practice which has been alleged of voluminous wrongdoing in Cook County, Illinois.

25.    **Defendant John M. D'Arco Esq** (herein, "D'Arco") is the managing partner at Beermann LLP.

26.    **Defendant James M. Quigley Esq** (herein, "Quigley") is an equity partner at Beermann LLP.

27.    **Defendant Enrico J. Mirabelli** (herein, "Mirabelli") is an equity partner at Beermann LLP.

28.    **Defendant Judge William S. Boyd** is an associate judge in the Domestic Relations Division in Cook County, Illinois, and is being sued in his personal capacity.

29.    **Defendant Judge Renee G. Goldfarb** is an associate judge in the Domestic Relations Division in Cook County, Illinois, and is being sued in her personal capacity.

30.    **Defendant Kathryn Ciesla Esq** is an attorney at Ciesla Beeler, LLC in Northfield with a reputation as a "fixer" in the North Shore in relation to complex, contentious and disputed family law proceedings.

## THE RACKETEERING ACTIVITIES OF BEERMAN LLP

31.    Upon information and belief, John M. D'Arco conceived of the idea to fund a *de minimis* scholarship (thereby incurring *de minimis* cost for Beermann LLP) for African-American law students in honor of (African-American) Judge Boyd sometime after the George Floyd protests. His idea was to create a pretext to convene regular in-person meetings with Judge Boyd in order to exercise improper influence over family law proceedings. Upon information and belief, he selected James M. Quigley to be the face of Beermann LLP with respect to administration of the scholarship because Mr. Quigley's wife is African-American.

32.     Upon information and belief, D'Arco and Quigley had a number of in-person meetings outside of their office at Tufano's Vernon Park Tap in the Little Italy neighborhood located at 1073 W. Vernon Park Place to discuss the idea of Beermann LLP funding the scholarship as a pretext to convene regular in-person meetings with Judge Boyd.

33.     On or around April 2021, the American Academy of Matrimonial Lawyers set up a scholarship in Boyd's name funded by Beermann LLP: the scholarship committee is chaired by James M. Quigley, a partner at Beermann LLP.[2]  Per the structure of the endowed scholarship, only one *de minimis*[3] award of $5,000 is issued *annually* – in effect, the scholarship is a sham on its face – to a selected African-American law student who expresses an interest in family law. Quite ironically, Beermann LLP does not employ a single African-American person in its entire roster of attorneys[4].

34.     In the period since the scholarship in Boyd's name was funded by Beermann LLP, upon information and belief, Judge Boyd has had a number of in-person meetings[5] at Petterino's restaurant at 150 N. Dearborn Street with James M. Quigley and Enrico J. Mirabelli in which he has accepted envelopes from these attorneys from Beermann LLP containing cash payments in exchange for promising to deliver specifically requested favorable decisions for Beermann LLP clients involved in pending family law proceedings in Cook County.

---

[2] Scholarship in Boyd's Name Funded by Beermann LLP.

[3] As reported by a Forbes Article from April 2024: "According to data reported by the Law School Admission Council (LSAC), the average annual cost of tuition for private law school students was $55,963 as of 2023. At public law schools, in-state enrollees paid an average of $30,554 per year, and tuition for out-of-state students averaged $43,590."

[4] Per the Beermann LLP corporate website as observed on July 31 2024: Attorneys - BEERMANN LLP - Divorce and Family Law in Chicago (beermannlaw.com).

[5] Upon information and belief, these in-person meetings also take place at events convened by the American Academy of Matrimonial Lawyers. Enrico J. Mirabelli and James M. Quigley are pictured together with Judge Boyd and his wife at another event hosted by the American Academy of Matrimonial Lawyers in April 2023: https://aaml-illinois.org/events-2022/

35.     Prior to the establishment of the scholarship, upon information and belief, in the period from 2018 through 2021, one or more subordinates of Judge Boyd have had a number of in-person meetings at Tufano's Vernon Park Tap in the Little Italy neighborhood located at 1073 W. Vernon Park Place with John M. D'Arco in which those subordinates have accepted envelopes containing cash payments in exchange for promising to deliver requested favorable decisions for Beermann LLP clients.

36.     Upon information and belief, John M. D'Arco is an avid golfer and frequents golf courses in the Hinsdale area – including without limitation the LaGrange Country Club – where certain of his family members reside. On various such golf outings in the Hinsdale area from 2018 through 2024, he has been overheard bragging alternatively (a) that he "owned" various of the family law judges in Cook County, and (b) that various family law judges in Cook County were on his payroll.

37.     Upon information and belief, Judge Boyd has shared some of the cash payments received from Beermann LLP with Judge Goldfarb wherein Beermann LLP has requested favorable rulings on proceedings before her – including those initiated by Jane Girard. Upon information and belief, Judge Boyd has similarly shared some of the cash payments received from Beermann LLP with other family law judges in Cook County. Upon information and belief, Judge Boyd serves as a gatekeeper to Beermann LLP to certain other judges in the family law courts in Cook County including without limitation Judge Goldfarb.

38.     Shortly after Enrico J. Maribelli entered his appearance in the family court matter on which Jane Girard was represented by Beermann LLP, a number of family law practitioners interviewed by Plaintiffs instructed Plaintiffs that Enrico's appearance materialized because "he is in with Boyd." In a shared elevator ride, Enrico J. Maribelli orally represented to Kenton

Girard that the only way to terminate the proceedings was for Kenton to agree to "full custody of [the minor children Gw. and Gr.] and to **pay all legal fees incurred by Jane owing to her representation by Beermann LLP**". He later disavowed having such an encounter with Kenton and further disavowed that such terms had to be met in order to terminate the proceedings. Upon information and belief, Maribelli is well-versed in disavowing private in-person meetings such as those in which he has passed cash payments to Judge Boyd at Petterino's restaurant. In any case, this oral representation to Kenton exposes the essence of how the scheme profits Beermann LLP.

## HOW BEERMAN LLP PROFITS FROM ITS BRIBERY SCHEME

39.     Upon information and belief, it is the *modus operandi* for Beermann LLP to have an inordinate number of legal professionals (in many cases 8-12 separate attorneys) work on behalf of their clients for the express purpose of generating wildly inflated – and flatly unnecessary – billings and then to seek payment from the high-net-worth counterparty.

40.     As part of a *quid pro quo* with its loyal network of family law consultants, therapists, evaluators, guardians ad litem and the like, these various functionaries which play crucial roles in the anatomy of a family law proceeding all bill excessively knowing that as long as they deliver favorable decisions and opinions to the clients of Beerman LLP in courtrooms "owned" by Beermann LLP there is no ceiling imposed on their billing extravaganzas. Upon information and belief, one of the evaluation reports commissioned by the family court here resulted in billings of in excess of $60,000 when the initial estimate was for $30,000.

41.     Another dirty trick widely employed in the family law proceedings involving Beermann LLP is to fabricate probable cause against the counterparty (typically a high net worth father) to force him to deal with either the stressful prospect of an actual criminal proceeding or an actual criminal proceeding, very often for battery against the wife/Beermann LLP client.

42.    Here, upon information and belief, Beermann LLP directed one of the minor children's medical care providers – Dr. Detjen – to fabricate a report of harassment by Kenton Girard to the Kenilworth Police Department[6]. Upon information and belief, in other cases Beermann LLP is behind the filing of actual (but unjustified) criminal charges against counterparties to gain leverage and enjoy more legal billings and in some cases upon successful petitioning for full custody of the children in such scenarios shared financial recovery depending on the contingency structure, if any, of the retainer agreement executed with the client.

43.    In short, Beermann LLP elevates its own financial interests above the best interests of the client, the children and the family unit in an obnoxious and intolerable affront to the traditional values and morals of the legal profession and for the express purpose of maximizing its legal billings. The counterparty always pays dearly – always in financial terms, sometimes getting mired in the jaws of the Cook County criminal justice system – when Beermann LLP is in the courtroom, regardless of the factual background or the merits.

## JANE GIRARD AS WOULD-BE CRIMINAL DEFENDANT

44.    In addition to being accused of child sex assault by her own minor children, and being initially referred for prosecution by the DCFS in May 2023 pursuant to a report from minor child Gr. therapist Chris Aguirre, Jane Girard was also sued by Plaintiffs for making illegal recordings.  The underlying allegations were in effect allegations of serious criminal wrongdoing punishable by a prison sentence.

45.    In another incident, Jane Girard planted an Air Tag on the personal vehicle of Marissa Girard. Indeed, the story received media attention from NBC Chicago, Fox 32 Chicago and … See Apple AirTag found underneath Glencoe woman's car – NBC Chicago, Cook County

---

[6] He did in fact file a report with the Kenilworth Police Department on October 21, 2022 under incident number 2022-000111280.

*Girard v. Village of Glencoe et al.*

woman finds Apple AirTag on car after iPhone notification: 'My movements were being tracked' (fox32chicago.com). Such evidence was also tendered to the Glencoe Department of Public Safety via Detective Ryan McEnerney. In spite of clear and convincing evidence of illegal surveillance and emplacement of the Air Tag pointing to Jane Girard, Detective Ryan McEnerney similarly closed that investigation as "unfounded", thereby refusing to request charges from the States Attorney of Cook County[7].

46.     Upon information and belief, Ms. Ciesla is a known "fixer" in the North Shore with a reputation for engaging in extrajudicial undertakings on behalf of paying clients vulnerable under proceedings in the family law courts in Cook County and Lake County.

47.     Upon information and belief, not only did Ms. Ciesla pay off Detective Ryan McEnerney but she also was behind the unconstitutional gag order of July 25, 2023 which was instituted against the minor children by tattling on the minor children's use of social media (allegedly in a manner prejudicial to Beermann LLP) to the then-guardian ad litem, Vanessa Hammer, who enthusiastically supported prior restraints on their speech.

48.     Upon information and belief, a number of other residents of Glencoe contacted the Village of Glencoe to explain why they declined to request charges against Jane Girard with respect to the Air Tag incidents, the illegal recordings and the sexual assaults of her estranged minor children. Pressure has been building on the Village of Glencoe to the point that Detective McEnerney has sent an unsolicited email message to Marissa Girard on or around July 30 2024 for the express purpose of offering a discussion at the offices of the Department of Public Safety to explain their rationale for not pursuing criminal charges against Jane Girard.

49.     In the weeks leading up to the filing of this lawsuit, Plaintiff Marissa Girard has

---

[7] It is an unfortunate reality that requests for criminal charges must be typically made by the local police department. As an unintended consequence, many local police departments run their organizations like private fiefdoms with no accountability as to the felony cases they send to the State Attorney for prosecution.

indeed spread word about the intentional and repeated failures to investigate by Detective McEnerney and the Village of Glencoe as to prima facie evidence of criminal wrongdoing. In response, literally dozens of similarly victimized individuals have come forward complaining of mistreatment by Detective McEnerney. Plaintiffs believe supervision of the Department of Public Safety, as sought below, would indeed lead to prosecution of Jane Girard.

## FAMILY LAW PROCEEDINGS FLOUT THE LAW AND ETHICS

50.     Vannessa Hammer was appointed guardian ad litem on September 9 2022 by order of Judge Boyd in the Girard family law proceedings with respect to *inter alia* all issues to the motion to appoint parenting coordinator, motion to compel enrollment in therapy, motion to modify parenting time decision-making and other relief.

51.     When the minor children revealed that they had received great interest in their social media postings about their perceptions of being treated unfairly by Beermann LLP, their therapist Gwenn Waldman immediately shared such information with Ms. Hammer, who in turn advocated for shutting down the children's collective voice. Needless to say, patient confidentiality was breached and Ms. Hammer wildly overstepped her mandate. But alas, this is typical of proceedings "owned" by Beermann LLP.

52.     Phyllis Amabile MD was appointed by the family court as the 604(b) evaluator by order of Judge Boyd on February 3 2023, in which position she charged handsomely for her recommendations which concerned all parties. Amabile was approved by the court but proposed by Beermann LLP, and has indeed been often appointed as a preferred 604(b) evaluator for Beermann LLP. Her mandate here was "all post-decree parenting issues, all pending post-decree pleadings, and expedited analysis of minor children's resist/refusal behaviors." In reality, she

was there to bill like mad. Her initial estimate came in around $30,000 and she ended up billing in excess of $60,000 for her report.

53.     During family court ordered mediation, the mediator suggested the minor children meet with her. During said meeting, the minor children disclosed they had been sexually assaulted by Jane Girard and refused to live with their estranged mother as a result. Beermann LLP then advised Jane to seek her own therapy with Ruth Kraus. Eight months later the Cook County family court ordered the minor children to start seeing Gwenn Waldman, another therapist from Breakthroughs Family Solutions and colleague of Ruth Kraus. Over the Plaintiff's energetic objections as to a conflict of interest, the court ordered the same.

54.     After only two counseling sessions, Gwenn Waldman disclosed confidential information from minor child Gr. with Ruth Kraus (also of Breakthroughs Family Solutions) who relayed such information – wrongfully – to Jane Girard.

55.     When minor child Gr. became aware of the same and confronted Gwenn Waldman as to this breach of client confidentiality, Gwenn Waldman tried to force minor child Gr. to sign a legal release without the benefit of review by an attorney. Unable to obtain the signature of minor child Gr., Gwenn Waldman then asked Plaintiff Kenton Girard for his signature thereunder, which he also accordingly refused. This conduct was reported in a complaint to the IDFPR lodged by the Plaintiffs.

56.     Breanna Traub served as therapist for minor child Gw. Upon information and belief, she also breached client confidentiality and illicitly leaked information acquired during therapy sessions to Jane Girard. Upon information and belief, Beermann LLP orchestrated that illicit information sharing by Breanna Traub. Plaintiffs filed a separate IDFPR complaint against Ms. Traub in fact.

57.     Phyllis Amabile MD and Gwenn Waldman were subpoenaed by the Plaintiffs in the family law matter. However, neither of them responded to those lawfully issued subpoenas or follow-on motions to compel. Predictably, the judges being "owned" by Beermann LLP, there was no penalty or consequence for their willful and illegal non-compliance with those requests. By contrast, Judge Boyd dignified every transparent effort to gin up unnecessary legal fees with a briefing schedule. For example, on November 3 2022, he set a briefing schedule for a *Verified Petition for Rule to Show Cause for Adjudication of Indirect Civil Contempt*. He did similarly for other ill-intended "emergency" motions and petitions including various motions to compel compliance.

58.     On July 24, 2023, Kenton's attorney Joe O'Brien, also served Vanessa Hammer with a subpoena commanding her appearance at a deposition on August 28, 2023 at 1:00pm and requesting certain documents. The subpoena was properly issued and served in accordance with all applicable rules governing notice and service of process.

59.     Vanessa Hammer failed to appear for the August 28 deposition and has further flouted a series of follow-up email messages. Such noncompliance was of zero concern to the family law court: multiple motions to compel inspired no judicial direction or action against Ms. Hammer.

60.     The following day, the court signed a **July 25, 2023 Gag Order** providing in pertinent part as follows: "2. Kenton Girard, Petitioner (hereinafter "Kenton") and Marissa Girard, Third Party Respondent (hereinafter referred to as "Marissa"), shall oversee the deletion of all of the minor children's social media postings which relate to this instant litigation/case, including but not limited to postings that relate to this case on: Instagram accounts (including but not limited to ), TikTok accounts, Facebook accounts, and/or any other social media accounts,

platforms/and/or web sites. Kenton and Marissa shall oversee that the children delete all such postings within 24 hours of this Court's Order."

61.     The **July 25, 2023 Gag Order** further provides: "3. Kenton Girard, Petitioner, and Marissa Girard, Third Party Respondent, shall instruct the minor children, and shall oversee, that neither child shall post any social media postings related to the instant litigation. 4. The Court finds that the children have a relationship with Kenton and reside solely with Kenton and Marissa (though not via Court Order); as such, Kenton shall inform the children of the appointment of the Child Representative, Joel Levin, prior to the children's first meeting with him. 5. Kenton and Marissa shall oversee and shall instruct the children not to communicate with or be interviewed by any reporters, media personalities, and the like…"

62.     In short, the gag order is obviously unconstitutional and of a First-Amendment-offending nature. What is noteworthy is that Beermann LLP fought hard to put the gag order in place – as they will almost certainly attempt to do when the instant complaint is filed. They were extremely paranoid about social media postings the minor children made which received hundreds of thousands of views, exposing some of the inequities perpetrated against them by Beermann LLP. Fundamentally, Beermann LLP does not want prying eyes into its racketeering activities and its manipulations of family law proceedings in Cook County.

63.     Around the same time, Judge Boyd pronounced that the minor children were "acting like terrorists" and boldly declared that he would not be "bullied by a 15-year-old". As Kenton Girard noted in an interlocutory appeal of the gag order, such inflammatory language indicates preconceived notions that may taint the court's future decisions concerning these children and further erodes trust in the proceedings.

64.     Somewhat incredibly, a petition for substitution of judge for cause filed by Kenton Girard although denied by a third party judge led to Judge Boyd voluntarily stepping aside. However, the excitement died down when the replacement Judge Goldfarb declared upon taking the helm that she "answered to Boyd" and that the trial would proceed according to Judge Boyd's wishes.

65.     Such a replacement of judge – wherein the replacement is merely following the orders of the judge *replaced for cause* – indeed flies in the face of the correct operation of the 5/2-1001(a)(3). Such a scenario cannot possibly represent what the Illinois General Assembly intended when that statute became law in Illinois.

### INACTION AND DERELICTION BY THE VILLAGE OF GLENCOE

66.     The failure of Detective McEnerney to request criminal charges as to the Air Tag incident mirrors his failure/refusal to request child sex charges against Jane Girard.

67.     Indeed, a similar wrongful emplacement of an air tag to track a woman in Goshen, Connecticut, correctly resulted in the filing of criminal charges against the suspect. See the story as reported by NBC Connecticut: AirTag used to stalk Goshen woman, police say – NBC Connecticut. Competent police – as in Goshen CT – request charges when the evidence is good.

68.     Upon information and belief, the Glencoe Police Department has been called on over one hundred (100) sexual assault cases since 2019 – all in which the victim was a woman or girl – and charges have been filed in less than five of those cases.

69.     Given the pervasiveness, Detective McEnerney not only tolerated but ratified the Department of Public Safety's practice of not diligently investigating sexual assault cases by (a) failing to properly supervise the Department of Public Safety, (b) failing to properly train Department of Public Safety personnel, (c) failing to forward evidence of the criminal acts

committed against the minor children Plaintiffs Gw. and Gr. and other female victims of sexual assault for prosecution; (d) failing to ensure forensic evidence of the sexual assault of minor children Gw. and Gr. and other female victims was not ignored; (e) failing to ensure that sexual assaults and rapes that occurred in Glencoe were investigated; (f) failing to ensure evidence of the penetrative sexual assaults of the minor children Gw. and Gr. and the sexual assaults as to other female victims was not lost or mishandled; (g) failing to discipline, restrict or control Department of Public Safety personnel for failing to investigate the sex crimes against the minor children Gw. and Gr. and sexual assaults as to other female victims; and (h) failing to ensure proper recordkeeping of forensic evidence records and documents.

70.     Defendant McEnerney never informed Plaintiffs of the Village of Glencoe's policy, practice and/or custom of systematically failing to investigate rapes and sexual assaults against women and girls.

71.     Defendant McEnerney never informed Plaintiffs that the Department of Public Safety did not conduct any meaningful investigation into the penetrative sexual assaults of the minor children Gw. and Gr.

72.     Defendants McEnerney and Village of Glencoe did not make public its policy, practice and/or custom of failing to investigate rapes and sexual assaults, and Plaintiff has uncovered no evidence that suggests that the Village of Glencoe ever informed any party outside of the Department of Public Safety and the Village of Glencoe as to the Village of Glencoe's policy, practice and/or custom of failing to investigate rapes and sexual assaults.

73.     Through its non-disclosure, Defendants McEnerney and Village of Glencoe ensured that they were the only individuals or entities that had evidence of Village of Glencoe's failure to investigate the penetrative sexual assaults of the minor children Gw. and Gr. by their

estranged mother Jane Girard and of the Village of Glencoe's general policy, practice and/or custom (dating back to at least 2019) of not investigating rapes and sexual assaults against women and girls.

74.     Defendant McEnerney and Village of Glencoe's silence and inaction independently prevented anyone outside of Village of Glencoe and the Department of Public Safety from knowing about Village of Glencoe's decision not to investigate the sexual assaults against the minor children Gw. and Gr. and rapes committed against other women and girls.

75.     Defendant McEnerney and Village of Glencoe's continued failure to investigate the sexual assaults against the minor children Gw. and Gr. harmed and continues to harm Plaintiff.

76.     Since the time of the penetrative sexual assaults against the minor children Gw. and Gr., Defendants' actions have denied and continue to deny Plaintiffs Gw. and Gr. and all sexual assault victims in Village of Glencoe justice for these horrible crimes. Because of Defendants' decision not to conduct an investigation into these sexual assaults of Gw. and Gr. and Defendants' efforts to conceal that decision, Jane Girard has not and will not be tried for committing two separate counts of penetrative sexual assault against her estranged minor children Gw. and Gr.

77.     As a direct result of Village of Glencoe's actions, Plaintiffs have suffered extreme emotional and physiological damage: first from not knowing if or when Jane Girard might commit further sexual assaults against them (which remains likely considering that in the family court matter Jane continue to seek full custody of Gw. and Gr.), and then further damage upon learning of Defendants' deliberate indifference to these outrageous sexual assaults committed.

*Girard v. Village of Glencoe et al.*

78.     On or around June 2021, Jane Girard brutally sexually assaulted by penetration her estranged minor child Gw. who was at that time only thirteen (13) years old.

79.     On or around February 2022, she committed the same offense against her other estranged minor child Gr. who was at that time approximately fourteen (14) years old.

80.     Upon information and belief, the manner of both assaults involved Jane Girard forcibly and repeatedly alternatively inserting her fingers and a tampon into the vaginal openings of the minor children Gw. and Gr. Upon information and belief, both of these assaults took place in the residence of Jane Girard at 90 Linden Ave in Glencoe.

81.     As a direct and proximate result of these attacks, the minor children thereafter decided that they felt both uncomfortable and unsafe residing – even part of the time – with their estranged mother. Since August 2022, both minor children Gw. and Gr. have resided full-time with their father Kenton and step-mother Marissa.

82.     Separately, in an apparent continuing pattern of abuse perpetrated by Jane Girard, on or around April 28 2023, minor child Gr. reported to DCFS that on multiple dates she had been locked in the car by her mother, yelled at for over an hour sometimes, and felt trapped. She asked multiple times for her mother to release her so she could go to swim practice and her mother refused.

### MCENERNEY SHUTS DOWN THE CRIMINAL CASES

83.     Detective McEnerney from the Department of Public Safety of the Village of Glencoe opened a separate criminal investigation for each minor child under investigation numbers 23-08604 and 23-08597. The Department of Public Safety is a division of Defendant Village of Glencoe, Illinois.

84.     On July 31 2023, the DCFS spoke with Detective McEnerney. This CPS

discussed the interviews with the children, and the children's father. This CPS advised that this CPS discussed the forensic interview process with the father and, after speaking with his children, they decided to proceed with the forensic interview process. This CPS and the detective discussed additional aspects of this investigation and agreed to remain in contact.

85.     The DCFS found the evidence supporting the sexual assaults against the minor children Gw. and Gr. to be so compelling that representative Chundra Brown told Plaintiffs in a visit to their home on or around May 2023 that Jane Girard would be charged for sexual assault.

86.     Upon information and belief, the DCFS was in regular contact with Detective McEnerney and clearly communicated to him their suggestion that he request the filing of charges with the States Attorney against Jane Girard for the commission of felony child sexual assaults. Upon information and belief, the DCFS communicated that it believed there was probable cause to arrest Jane Girard for these penetrative sexual assaults against her estranged minor children Gw. and Gr.

87.     Upon information and belief, Detective McEnerney completely ignored the charging request from DCFS and instead reached out to Jane Girard in hopes of receiving an illicit payment in exchange for his refusal to request felony charges with the States Attorney.

88.     Upon information and belief, the request from DCFS for the filing of criminal charges was contained in a written document prepared under the supervision of Director Maria Paredes.

89.     Upon information and belief, even in receipt of damning written reports prepared by DCFS at the behest of Maria Paredes, no one at the Village of Glencoe took any affirmative action as to requesting the filing of felony charges against Jane Girard.

90.     Since at least on or around 2019 when Detective McEnerney acquired a

significant voice and influence over the Department of Public Safety, the Village of Glencoe has engaged in a policy, practice, and/or custom of failing to investigate sexual assaults and rapes against females.

91. Defendants McEnerney and Village of Glencoe were responsible for establishing, implementing, and overseeing Village of Glencoe's policy, practice, and/or custom of failing to investigate rapes and sexual assaults against females and/or were responsible for overseeing and training others in the Department of Public Safety in accordance with that policy, practice, and/or custom.

92. Upon information and belief, since at least 2019, Village of Glencoe's policy, practice, and/or custom has been to not: (a) conduct in-depth follow-up interviews with sexual assault and rape victims, (b) conduct interviews with offenders, (c) act on recommendations by the Illinois State Police or DCFS or other state agencies, or (d) attempt to preserve evidence that could aid in the investigation of rapes and sexual assaults. That policy, practice and/or custom was established, implemented and overseen by Defendants McEnerney and Village of Glencoe.

93. On August 31 2023, Austin G. Altman from DCFS spoke with Detective McEnerney. Detective McEnerney advised that he would likely be speaking with his supervisor about closing the law enforcement investigation. Shortly thereafter, Detective McEnerney paid a personal visit to Plaintiff's home and announced their investigation was unfounded.

94. On September 7 2023, the DCFS informed Jane Girard and her attorney – one Ms. Hansen, not affiliated with either Beerman LLP or Kathryn Ciesla – that the charges were "unfounded". Two days later on September 9 2023, DCFS supervisor Maria Paredes declared that "At this time there is insufficient evidence to support the allegation of Sexual Molestation" noting that the reason for her finding was that the "[c]riminal case was closed and unfounded."

*Girard v. Village of Glencoe et al.*

95.     In other words, by declaring the criminal investigations of Jane Girard "unfounded", Detective Ryan McEnerney set into motion a nullifying wave not only over the prospect of criminal prosecution but also the involvement of the DCFS with respect to making binding recommendations as to the best interests of the minor children.

### THE GLENCOE CORRUPTION IS PART OF A LARGER PATTERN

96.     This disturbing practice of not properly investigating sexual assaults against women is part of a larger trend nationally. See New York Times article: These Rape Victims Had to Sue to Get the Police to Investigate - The New York Times (nytimes.com).

97.     According to the New York Times, in Austin, where a lawsuit was filed last June, the plaintiffs include a woman who said that the police collected no evidence from the crime scene after a rapist broke into her apartment; a University of Texas student whose screams for help were recorded but whose case was dropped when her attacker, a stranger, claimed the sex had been consensual; and another student who said she was forcibly taken to a motel and raped by three men, one of whom was not arrested even when his DNA was in her sexual assault kit.

98.     According to the New York Times, these lawsuits face an uphill legal battle, with hurdles ranging from the technical, like exceeding the statute of limitations, to the substantive, such as a ruling in Houston that there is no requirement that police investigations be timely. But whatever obstacles the suits face, they present evidence that some law enforcement agencies foster attitudes toward sexual assault victims that make justice unlikely.

99.     In one deposition in an Illinois case, a commander said he believed that half of the reported sexual assault cases in his precinct were false (researchers say the actual incidence of false reports is between 4 and 7 percent). Detectives in San Francisco told a survivor that she should not have been out partying because she weighs less than a man and had her period.

22                                                              *Girard v. Village of Glencoe et al.*

100.     Illinois' Sexual Assault Evidence Submissions Act, which took effect on September 1, 2010, required all Illinois law enforcement agencies, including without limitation the Village of Glencoe Department of Public Safety, to provide to the Illinois Department of State Police a written inventory of the number of Evidence Kits that had not been submitted to a laboratory for analysis. (720 ILCS 202/20) (2010).

101.     The Sexual Assault Evidence Submissions Act also requires the Department of Public Safety to submit for testing all collected Evidence Kits that are or were at the time of collection "the subject of a criminal investigation." (720 ILCS 202/20). An Evidence Kit should be the subject of a criminal investigation unless it is determined that the Evidence Kit was not taken in connection with a crime—cases in which the alleged victim has recanted, for example.

102.     Defendants' continued failure to investigate the sexual assaults against Gw. and Gr. harmed and continues to harm Plaintiffs.

103.     In addition, as a result of Defendant McEnerney and Village of Glencoe's actions, Plaintiffs suffered extreme emotional and physiological damage: first from not knowing if or when Jane may assault again, and then further damage upon learning of Defendants' deliberate indifference to her documented sexual assaults of the minor children Gw. & Gr.

104.     As the Supreme Court explained under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), a Section 1983 claim does not lie against a municipality solely on the basis of vicarious liability. Instead, the plaintiff must demonstrate that the municipality had an official policy or unofficial practice or custom that was deliberately indifferent to civil rights in general and that violated the plaintiff's civil rights in particular.

105.     To successfully prosecute a Monell claim, a plaintiff must demonstrate "a persistent and widespread practice" that is "so permanent and well settled as to constitute a

'custom or usage' with the force of law." *Diaz v. Miami-Dade County*, No. 20-10245, 2021 U.S. App. LEXIS 6320, at *8-*9 (11th Cir. March 4 2021) (citations omitted). This standard "prevents the imposition of liability based upon an isolated incident." *Id* at *8 (citation omitted).

106.     Under FRCP 8(a), the pleading requirement for a Monell claim requires (1) a short and plain statement of the grounds for the court's jurisdiction; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought. Such "notice pleading" does not require detailed or specific factual allegations or in pleading special types of claims such as fraud and mistake.

107.     Indeed the Supreme Court has held that a Monell claim is subject to the ordinary rules of notice pleading and does not require detailed or specific factual allegations to survive dismissal. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-169 (1993). Instead, reasoned the court, a better time to scrutinize the facts supporting a Monell claim is during a motion for summary judgment, once discovery has taken place and enabled the parties to gather evidence. *Id*. at 169.

## THE RICO ENTERPRISE AND THE PREDICATE ACTS

108.     The RICO enterprise is a corporate entity and an association-in-fact enterprise that consists of Beermann LLP, its managing partner John M. D'Arco, James M. Quigley, Enrico J. Maribelli and various professionals at the firm. The enterprise is led by John M. D'Arco, who is the mastermind of the firm's strategy to illicitly "buy" family law judges in Cook County, Illinois and then profit from extravagant and unnecessary fee billings in family law proceedings approved by the judges which have been bribed.

109.     The predicate acts involved are bribery, in the form of handing envelopes of cash to Judge Boyd and his subordinates. Other firm professionals are involved in these bribery

schemes, by virtue of their involvement in matrimonial law associations and other professional associations.

110.    Upon information and belief, the typical sales pitch extended to prospective female clientele (who are seeking asset divisions or custodial rights) is that the firm "can do anything… we will get every last penny from your husband and full custody of the children." On its face, such a sales pitch smacks of extra-judicial manipulation, for how can a law firm assure any desired outcome irrespective of the merits without having pre-ordained control over the results of the underlying legal proceedings.

111.    The primary objective of the RICO enterprise is to secure the most compensation possible for clients and fees for the firm regardless of its active role in corrupting the fair administration of justice in the family law courts in Cook County, Illinois. Family law actions filed by Beerman LLP often specifically target high-net worth individuals, and affirmatively include actions targeting fathers residing in Florida, New York, California and Arizona.

112.    The scheme is quite simple: buy the judges, obtain the loyalty of the court-appointed personnel and experts who know that they can bill unreasonably in a Beermann LLP-controlled courtroom, task an inordinate number of attorneys to the case to generate maximum fee billings and the monies will flow into the coffers of Beermann LLP.

113.    As one expert repeatedly utilized by Beermann LLP and hired by Beermann LLP partner Jared Pinkus recently revealed during a recent deposition, results in court were always favorable to Beermann LLP clientele regardless of the merits.

114.    Upon information and belief, John M. D'Arco was exposed to the family business of bribery by his father John A. D'Arco Jr, who was convicted of bribery in a series of indictments brought against him in the Northern District of Illinois in the early 1990s. He was

tried and convicted of corruption under Operation GAMBAT. John A. D'Arco Jr served in the Illinois House of Representatives from 1973 to 1977 and the Illinois Senate from 1977 to 1992.

115. His grandfather John D'Arco Sr. served in the Illinois General Assembly and was investigated by the United States government involving his relationship with the Chicago Outfit because of Operation GAMBAT, but was never indicted despite his role in attempting to fix a murder trial for reputed hitman Harry Aleman.

116. The illicit bribes of family law judges by Beermann LLP and orchestrated by John M. D'Arco are not isolated incidents, but part of a broad and continuing pattern.

117. Unlike RICO theories predicated on common law fraud, which are often deemed insufficient under the law owing to the high burden of proof associated with common law fraud, the scheme here is much more bold and is founded on outrageous and repeated acts of bribery.

118. Here, John M. D'Arco, James M. Quigley and Enrico J. Mirabelli are each directly involved in predicate acts. Put simply, D'Arco and Quigley and Mirabelli not only knew about, agreed to participate in, and participated in the bribery scheme, they were each in part responsible for orchestrating the scheme as it involved the actions of other professionals in the family law industry, and in the legal world.

119. From another point of view, it appears that D'Arco is continuing the documented family business of bribery, as conducted by his father and grandfather before him.

120. Other individuals personally involved in the scheme include (a) appointable family law proceeding functionaries including child coordinators, custodial evaluators, parental evaluators, child therapists, family reunification therapists, guardians ad litem, and so forth; (b) outside lawyers such as Kathryn Ciesla Esq directed to engage in extra-judicial maneuvering to illicitly obtain advantage over opposing parties, and (c) local police departments who are

directed – or in some cases provided illicit consideration such as cash payments – to launch criminal investigations and even to recommend criminal charges. All of these individuals are directed by Beermann LLP to work in furtherance of favorable decisions and outcomes for their clients, and thereby increase fee billings for Beermann LLP and in some cases recovery from counterparties under contingency recovery clauses in some of their client retainer agreements.

121.    The scheme has included dozens of predicate acts over the course of the last decade, many of which are described in the preceding paragraphs. The primary predicate acts that form the basis of the racketeering activity are instances of bribery.

122.    Plaintiffs do not have access to all of the evidence showing how all of the bribes were effectuated but can identify specific overt acts were part of the scheme to demonstrate the frequency and long-running duration of predicate acts. This is not an exhaustive list of predicate acts, but provides examples of predicate acts currently known to Plaintiffs.

123.    The above-enumerated details of the bribery scheme are more than sufficient to establish the RICO enterprise, its goals and members, and how it worked, involving thousands of interstate mails and wires sent by Beermann LLP professionals in furtherance of the scheme.

124.    Defendants Beermann, D'Arco, Quigley and Mirabelli are in the exclusive possession or have exclusive knowledge of many interstate mails and wires that were part of the scheme. Discovery will reveal these additional predicate acts.

125.    The following are examples of certain interstate mails and wires sent as part of the scheme to extract excessive fee billings from family law proceedings before Beermann LLP bribed judges: (a) subpoenas sent to to out-of-state financial institutions, (b) discovery propounded in certain of the family law proceedings to parties residing in California, New York, Florida and Arizona, (c) email messages sent using the interstate wires by Enrico J. Maribelli

(who operates substantially out of Florida) and the various family law functionaries involved in nearly all of such family law proceedings. For example, in the Girard family law proceeding, numerous email messages were sent using the interstate wires by the guardian ad litem Vanessa Hammer (who operates her business substantially out of Texas), by the successor child representative Joel Levin (who operates his business substantially out of Arizona), by the court-appointed therapists Gwenn Waldman and Breanna Traub, and by the 604(b) evaluator Phyllis Amabile MD.

126. These are just some examples of the interstate mails and wire used by Defendants Beermann LLP and John M. D'Arco.

### COUNT I - VIOLATION OF RIGHT TO IMPARTIAL PROCEEDINGS
*42 U.S.C. § 1983*; *Boyd, Goldfarb*

127. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

128. By accepting bribes to render specifically requested favorable decisions to Beermann LLP clients, Judges Boyd and Goldfarb cannot claim judicial immunity here.

129. In 1927, the Supreme Court addressed a claimed violation of the right to an impartial judge. *Tumey v. Ohio*, 273 U.S. 510 (1927) involved a challenge to a conviction in a municipal court in which the mayor presided as the judge, for violation of the state's prohibition law, which resulted in a fine, a fraction of which was allocated to the mayor "in addition to his regular salary." *Tumey*, 273 U.S. at 518–19. The Court held that this improper financial motive violated the defendant's right to an impartial judge.

130. It is plain that the proceedings instituted by Jane Girard were not impartial: Judges Boyd and Goldfarb had already accepted bribes to render favorable decisions specifically inuring to the benefit of Jane Girard in these proceedings. The refusal by the court to compel subpoena compliance as to Defendants Hammer, Waldman and Amabile juxtaposed with on the

other hand approval of virtually all motions filed by Jane Girard demonstrates the lack of impartiality in those proceedings.

131.    Plaintiffs suffered injuries, damages and losses as a result of the violation of and interference with Plaintiffs' constitutionally protected right to an impartial judge including numerous adverse decisions which would not have been rendered by a fair, impartial judge.

### COUNT II - VIOLATION OF FIRST AMENDMENT RIGHTS
*42 U.S.C. § 1983*; *Boyd, Goldfarb*

132.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

133.    By accepting bribes to render specifically requested favorable decisions to Beermann LLP clients, Judges Boyd and Goldfarb cannot claim judicial immunity here.

134.    The prior restraints in the gag order issued against the minor children Gw. and Gr. constitute an impermissible violation of their First Amendment Rights.

135.    While the Illinois Appellate Court refused to overturn said gag order, it did so under the notion that the gag order was not "injunctive" in nature. The Illinois Appellate Court specifically side-stepped the constitutionality of the gag order.

### COUNT III - NEGLIGENCE
*Hammer, Hammer Serna & Quinn LLC, Waldman, Traub, Amabile, Paredes*

136.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

137.    All of the Defendants hereunder, as legal functionaries in family law proceedings, owed a duty of care to Plaintiffs, including a duty to ensure that all materials published on the docket in the family law proceeding instituted by Jane Girard were properly redacted to protect the minor children's privacy interests and/or to seal the record from public access. In particular, Defendants Waldman and Traub owed the minor children Gw. and Gr. a duty of maintaining therapist-patient confidentiality. Defendant Amabile had a duty to not turn her recommendations report into a fee extravaganza in extreme departure from her initial estimate of $30,000. Finally

Defendant Paredes as the director of the investigations and actions taken by DCFS in response to the felony criminal allegations against Jane Girard had a duty to request the filing of those charges at such point that Defendant Paredes concluded that such charges were justified.

138.    However, no protective orders or other measures were taken to protect or to redact highly sensitive information of the minor children hereunder, notably including explicit details as to the penetrative sexual assaults perpetrated against the minor children Gw. and Gr. with respect to the heinous acts committed by their estranged mother Jane Girard. Defendants Waldman and Traub specifically violated therapist-patient confidentiality by disclosing confidential information to Jane Girard (as to Waldman, via therapist Ruth Kraus also of Breakthroughs Family Solutions) and to Vanessa Hammer. In turn, Ms. Hammer and her firm Hammer Serna & Quinn LLC took no measure to redact the wholesale disclosure of information gleaned from highly confidential therapy sessions with the minor children Gw. and Gr. Defendant Amabile billed extravagantly in wanton excess of her initial estimate for producing her report, and Defendant Paredes reneged on her obligation to request the filing of felony charges against Jane Girard after she had already arrived at the determination that charges were justified, as evidenced by DCFS representative Chundra Brown telling Plaintiffs in May 2023 that sexual assault charges were indicated.

139.    As a result of these breaches of duties, the minor children were grievously harmed: (a) highly sensitive and embarrassing details are sitting on the docket for any member of the public to download, thereby jeopardizing their future careers and lives, (b) an unconscionable and unconstitutional gag order was implemented against all of the Plaintiffs as a result of patient privilege breaches, (c) the Plaintiffs incurred exorbitant and unreasonable fees from Amabile, and (d) because Defendant Paredes refused to perform her job duties, the minor children have to

live in fear of being assaulted again by their estranged mother Jane Girard, especially with the viable prospect of the bribed Judge Goldfarb ordering shared custody.

### COUNT IV - RICO (18 U.S.C. § 1962(c))
*Beermann, D'Arco, Quigley, Mirabelli*

140.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

141.    Each Defendants is a "person" under 18 U.S.C. § 1961(3). This is because each Defendant is capable of holding a legal or beneficial interest in property.

142.    Beermann LLP is a business enterprise, and the individual Defendants willing and knowingly conducted and participated in the firm's affairs through a pattern of racketeering activity that affected interstate commerce.

143.    The Defendants collectively also form an association-in-fact enterprise that includes family law functionaries proposed by Beermann LLP including without limitation: (a) appointable family law proceeding functionaries child coordinators, custodial evaluators, parental evaluators, child therapists, family reunification therapists, guardians ad litem, and so forth; (b) outside law firms directed to engage in extra-judicial maneuvering to illicitly obtain advantage over opposing parties, and (c) local police departments who are directed – or in some cases provided illicit consideration such as cash payments – to launch criminal investigations and even to recommend criminal charges. The Defendants willingly and knowingly conducted and participated in that association-in-fact enterprise through a pattern of racketeering activity that affected interstate commerce.

144.    The law firm enterprise and the association-in-fact enterprise affect interstate commerce because the enterprise members knowingly and routinely file family law actions in Cook County Illinois against (typically high net worth) defendants/respondents residing in other states for the purpose of extracting settlement and otherwise obtaining recoveries through a

pattern of racketeering activity. Family law actions filed by Beerman LLP specifically mentioned in this complaint include individuals residing in Florida, New York, California and Arizona. The conduct of the enterprises has affected interstate commerce because the enterprise members have obtained tens of millions of dollars (or more) in legal fees from individuals residing in Florida, New York, California and Arizona.

145.    The object of the law firm enterprise and the association-in-fact enterprise was to obtain legal fees, settlements or other shared recoveries – under retainer agreements with contingent recovery provisions – from family law defendants/respondents.

146.    In furtherance of their scheme, the Defendants reasonably foresaw the use of, and did in fact repeatedly use, or cause the use of, interstate mails and wires in furtherance of essential parts of the scheme.

147.    Each of the Defendants intended to obtain or cause the loss of money or property of family law defendants/respondents including the Plaintiffs hereunder by means of illicitly exercising control over family law judges in Cook County who had been bribed under a pattern of racketeering activity.

148.    Each of the Defendants engaged or took part in multiple instances of bribery in knowing furtherance of the enterprises' objectives. Numerous predicate acts of bribery were effectuated by the Defendants in knowing furtherance of the enterprises' objectives are set forth in detail in this complaint. These predicate acts by enterprise members in furtherance of the objectives of the law firm and association-in-fact enterprises span more than five years and were persistent through the entire time period.

149.    The predicate acts of bribery involve the interstate transmission by mail and wire of various communications and documents in furtherance of the objectives of the enterprises,

because in each instance a bribe is paid a specifically requested favorable outcome is delivered by the bribed judge and in many cases a specifically requested unfavorable outcome for counterparties residing in California, New York, Florida or Arizona. Those requested outcomes wherein they are unfavorable to out-of-state counterparties involve the gathering of financial records, tax and accounting statements, testimony and other evidentiary concerns via interstate transmissions as aforedescribed. Other interstate transmissions commonly include subpoenas mailed to out of state financial institutions and processing thereunder via use of email messaging using the interstate wires as well as discovery mailed to out-of-state parties and processing thereunder via use of email messaging using the interstate wires.

150. Additional instances of bribery effectuated by the Defendants that will demonstrate the pervasiveness of the pattern of racketeering activity are in the exclusive knowledge or control of the Defendants, and discovery will reveal these predicate acts.

151. In addition to bribery, each of the Defendants intended to obtain or cause the loss of money or property of family law defendants/respondents by means of exercising illicit control over the presiding Cook County family law judges with the consequent result that outrageous billing of fees would be allowed and contingent recovery be awarded by the compromised judges under a part of the pattern of racketeering activity.

152. The predicate acts of the Defendants were related in that they shared the same or similar purposes, results, participants, victims, methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events, but rather regular and integral steps in furtherance of the Defendants' scheme to illicitly grow their revenue by cementing an un-real (in fact manipulated) record of success before the bribed family law judges in Cook County, Illinois.

153.    The predicate acts of the Defendants also were continuous in that they have occurred on a regular basis since at least 2019, affected numerous family law matters, and upon information and belief, remain ongoing as to other pending and planned family law matters.

154.    There is a significant threat – and Plaintiffs fully expect – that the pattern of racketeering activity of the Defendants will continue into the future, even within the confines of the Girard family law proceeding. All proceedings are opportunities to charge as exorbitant of legal fees as possible. Furthermore, Beermann has many active family law matters, and continues to file and prepare new family law matters.

155.    The Defendants' predicate acts of bribery constitute a pattern of racketeering for purposes of 18 U.S.C. §§ 1961(5) and 1962(c).

156.    By reason of the Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in its business and/or property in an amount to be proven at trial.

157.    Specifically, the Defendants' violation of 18 U.S.C. § 1962(c) has proximately caused Plaintiffs to expend substantial money and resources to defend claims, motions, emergency petitions and all manner of unnecessary procedural developments all permitted to develop under rigged judicial proceedings due to the Defendants' pattern of racketeering activity.

158.    By reason of this violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to treble damages, attorney fees, costs, and interest on all of the foregoing.

### COUNT V - RICO (18 U.S.C. § 1962(d))
*Beermann, D'Arco, Quigley, Mirabelli*

159.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

160.    Beginning on or before 2019, and continuing through the date of this complaint, the Defendants knowingly and unlawfully conspired and agreed with each other to conduct the

affairs of the enterprises described above through a pattern racketeering activity that involved bribery.

161.    At all relevant times, each conspirator knew of and participated in this scheme through specific overt acts intended to further its objective of maximizing firm revenues at the expense of family law defendants/respondents.

162.    The Defendants knew about and agreed to the commissions of two or more predicate acts as part of the RICO conspiracy.

163.    The Defendants conspired to unlawfully collect payments from Plaintiffs via bribed judges presiding over manipulated proceedings ordering payments of attorneys fees for Beermanm LLP clients and otherwise cause them to spend money.

164.    By reason of the Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in its business and/or property in an amount to be proven at trial.

165.    By reason of the Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs are entitled to treble damages, attorney fees, costs, and interest on all of them.

## COUNT VI - UNJUST ENRICHMENT
### *42 U.S.C. § 1983*; *Beermann*

166.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

167.    The Defendants unjustly received a benefit from Plaintiffs by forcing Plaintiff to endure rigged judicial proceedings before family law judges which had been previously bribed. That benefit came in the form of legal fees and recoveries inflated by the rigged nature of the proceedings.

168.    The Defendants have unjustly retained that benefit to the detriment of Plaintiffs.

169.    The retention of the benefit that Plaintiffs conferred on the Defendants as a result of their unjust conduct violates fundamental principles of justice, equity, and good conscience.

170.     The Defendants are aware of and appreciate the benefits bestowed on them by Plaintiffs.

171.     The Defendants should be compelled to disgorge to Plaintiffs all unlawful and inequitable proceeds they received from Plaintiffs.

## COUNT VII - CIVIL CONSPIRACY
*Beermann, D'Arco, Quigley, Mirabelli, Ciesla, McEnerney, Boyd, Goldfarb*

172.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

173.     As particularly described above, the Defendants had a meeting of the minds on a common object to be accomplished and an agreement to commit wrongful acts to that end. Specifically, the Defendants knowingly and unlawfully conspired and agreed with each other to commit bribery to obtain inflated revenues in the course of rigged judicial proceedings from family law defendants including Plaintiffs.

174.     The Defendants committed various unlawful and wrongful acts as more particularly described above to extract payments and other recoveries from Plaintiffs and otherwise cause Plaintiffs to spend money.

175.     The Defendants were aware of each other's plans to commit the wrongful acts described in this complaint.

176.     Consistent with their agreement, the Defendants intended that the wrongful acts be committed.

177.     As a proximate result of the conspirators' civil conspiracy, Plaintiffs suffered compensatory damages in an amount to be proven at trial, which exceeds $100,000, exclusive of interests and costs.

## COUNT VIII - VIOLATION OF EQUAL PROTECTION CLAUSE
*42 U.S.C. § 1983*; *Village of Glencoe, Detective McEnerney*

178.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

179.    At all relevant times herein, Defendants McEnerney and Village of Glencoe and its Department of Public Safety acted under color of state law.

180.    At all relevant times hereto, all of the victims of rape or sexual assault reported to the Department of Public Safety were women or girls.

181.    At all relevant times hereto, Defendants McEnerney and Village of Glencoe followed an unwritten and ongoing policy or custom (established, implemented, overseen, and perpetuated by Defendant McEnerney and other individuals from the Department of Public Safety) of responding differently and affording less protection to victims of rape and sexual assault, who were exclusively female in Village to Glencoe, than to victims of other crimes. Upon information and belief resulting from Plaintiffs' investigation, Village of Glencoe's custom, policy and/or practice was to not investigate rape, of which all the victims were women and girls, as thoroughly as it did other crimes. For other crimes, Defendant McEnerney and other officers would interview witnesses, put together police reports and collect evidence. Based upon publicly available reports, these basic investigative steps were not taken for rape and sexual assault  cases as a matter of course. The fact that Defendant McEnerney and Village of Glencoe systematically investigated other crimes more thoroughly is evidence of its custom, policy and/or practice to give female rape victims less protection than victims of other crimes. Since at least 2019, Defendant McEnerney and his Department of Public Safety simply did not investigate rape and sexual assault cases.

182.    Based upon the pervasiveness of the practices and other facts described herein, at all relevant times, Defendants knew that female victim of rape and sexual assault had typically provided forensic evidence to the Department of Public safety, but that as a custom and practice, the Department of Public Safety was not taking steps to reasonably investigate the allegations.

Further, on information and belief, Defendants' failure to investigate rape and sexual assault cases was not oversight, but a conscious choice not to investigate or pursue rape and sexual assault cases. Even in situations in which a rape victim provided the name of her rapist and submitted herself to the taking of forensic evidence, Village of Glencoe did nothing. In other words, even for rapes that required no investigation, for which all Defendants had to do was request the States Attorney to file criminal charges, Defendants' standard operating procedure was to do nothing.

183.    Based upon the facts alleged herein, the only logical conclusions that can be reached are that Village of Glencoe's policy of discriminating against victims of rape adversely affects women and girls, and further, that Defendants adopted the policy of not investigating rape crimes because of its adverse impact on women and girls, like Plaintiffs. There is no other plausible explanation— except for an animus towards women and girls—as to why the only crime for which 100% of the victims are female was and is systematically investigated less (by not being investigated at all) than other crimes for which women and girls did not entirely comprise the victim population.

184.    Defendants' systematic disregard of its duty toward its rape victims cannot plausibly be explained as merely the uneven allocation of police resources, because the impact of that conduct exclusively harmed women and girls. Instead, Defendants' approach to rape cases must be construed as the selective, intentional withdrawal of police protection for rape victims on account of their sex.

185.    In furtherance of its unconstitutional policy, Defendants, with deliberate indifference, failed to train its police officers as to the rights of female victims of rape with whom the police came into contact, including but not limited to Plaintiffs.

186.    Defendants' deliberate indifference and willful and wanton conduct created a danger of an increased risk of harm to female victims of rape, including Plaintiff, by failing to investigate rape crimes.

187.    Village of Glencoe's policies identified herein have no rational basis and do not bear a substantial relationship to any important governmental objective.

188.    Defendants followed its discriminatory policy, practice, and/or custom in connection with Plaintiffs rape. In doing so, Defendants violated Plaintiffs' constitutional rights.

189.    Based upon the preceding factual allegations, Defendants were at all relevant times aware that the Department's investigation of rape and sexual assault cases was essentially non-existent and was materially worse than its efforts to investigate other crimes. Moreover, Defendants knew that this fact had a disparate impact on women and girls as all rape victims were female. In the face of this knowledge. Defendants took no steps to rectify this disparity. Consequently, it must be concluded that not only were Defendants conscious of the disparate treatment and its impact on women and girls, but Defendants also knowingly decided not to rectify the problem. The only logical explanation for Defendants' failure to take any steps to alleviate the harm being done to rape victims, like Plaintiff, is that Defendants' failure was intentional and was motivated by Plaintiffs' sex and the sex of the other rape victims.

190.    Plaintiffs injuries are the result of Village of Glencoe's unconstitutional, discriminatory municipal policy or custom, and/or practice.

191.    As described above, the constitutional injury Defendants inflicted on Plaintiff was caused by persons with final policymaking authority for the Village of Glencoe.

192.    The above described conduct of the Village of Glencoe and Defendant McEnerg[constitutes a violation of 42 U.S.C. § 1983 as Defendants' conduct deprived Plaintiff

of her rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

193.    Plaintiffs are entitled to compensatory damages and other non-pecuniary relief.

## COUNT IX - INJUNCTIVE RELIEF
### *Village of Glencoe, Detective McEnerney*

194.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

195.    The minor children Gw. and Gr. continue to reside with their father in Glencoe and may be even soon ordered to reside in the home of their estranged mother at 90 Linden Avenue in Glencoe. Consequently, because Plaintiffs are girls, they are at ongoing risk of the Department of Public Safety ignoring and failing to investigate additional sexual assaults that may be committed against them in Village of Glencoe.

196.    Plaintiff is entitled to injunctive relief mandating that the Village of Glencoe meaningfully investigate rape and sexual assault cases involving female victims.

197.    In order to seek help from Village of Glencoe, rape victims, like minor children Gw. and Gr., must undertake— immediately after being raped—an emotionally scarring process whereby they subject their bodies to invasive and intrusive medical procedures in order to collect forensic evidence.

198.    Plaintiffs and other similarly situated women and girls who report their rapes or sexual assaults to the Department are required to relive the rape or sexual assault by telling Department personnel what happened.

199.    These have been and continue to be painful, traumatic experiences for Plaintiffs and similarly situated female rape or sexual assault victims, and the reason Plaintiffs and these other women and girls undertake these steps is to help the Department meaningfully investigate their rapes or sexual assaults and hopefully bring the perpetrators to justice.

200.    Instead, Village of Glencoe engages in a policy, practice, and/or custom of failing to investigate rape cases. As part of that policy, practice, and/or custom, Village of Glencoe, through the Department and the Individual Defendants, ignores the charging requests from DCFS and other state agencies ignores forensic evidence, fails to follow up on the testing of forensic evidence, and ignores the statements of victims, like Plaintiff. In doing so, the Village of Glencoe effectively victimizes rape and sexual assault victims, including the minor children Gw. and Gr., for a second time, as they subject themselves to invasive and traumatic physical and verbal examinations with no chance that such treatment will result in justice.

201. Without the intervention of this Court, neither Plaintiffs nor other female rape and sexual assault victims can stop Village of Glencoe from continuing its violations of equal protection.

202.  Consequently, Plaintiff seeks injunctive relief requiring Village of Glencoe to cease the equal protection violations and other violations it is and has been committing against female rape and sexual assault victims since at least 2019, and to establish and disseminate policies and procedures that ensure that allegations of rape and sexual assault are diligently investigated. These policies and procedures should include: 1) training members of the Department of Public Safety in how to properly investigate rape and sexual assault cases; 2) sending forensic evidence to labs for preliminary testing; 3) drafting police reports pertaining to forensic evidence; 4) conducting interviews with potential offenders where they are identified; 5) reviewing the lab results of forensic evidence, and conducting follow-up when appropriate; 6) conducting follow-up interviews with rape victims; 7) preserving investigation evidence; and 8) reporting all rape and sexual assault cases to the Cook County State's Attorney's Office. In addition, the Court

should appoint a Receiver, Monitor or Special Master to ensure these required changes are implemented.

WHEREFORE, Plaintiff prays this Court grant the following relief:

1) Compensatory damages in an amount to be determined at trial;

2) Trebled damages attributable to the RICO claims, as permitted by 18 U.S.C. § 1964;

3) Disgorgement to the benefit of Plaintiffs of the benefits received by Defendant Beermann unjustly;

4) Attorneys fees, costs, and pre- and post- judgment interest;

5) Injunctive relief prohibiting Beerman from continuing to operate its family law practice in Cook County, Illinois;

6) Injunctive relief requiring The Village of Glencoe to meaningfully investigate rape and sexual assault;

7) The appointment of a Receiver, Monitor, or Special Master to oversee the operations of the Village of Glencoe Department of Public Safety;

*Girard v. Village of Glencoe et al.*

8) Nominal damages for the numerous articulated violations of various of Plaintiffs' constitutionally protected rights;

9) Punitive damages where appropriate against the Defendants on all counts in which they are implicated;

10) Such other relief that this Court may deem just, equitable and proper.

Dated: August 2, 2024                    Respectfully Submitted,

                                         KENTON GIRARD, *In Pro Se*

                                         /s/ Kenton Girard
                                         965 Forestway Drive
                                         Glencoe, IL 60022
                                         Email: kg5252@yahoo.com
                                         Tel: 773-575-7035