

**FILED**
12/9/2024

MEN

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| KENTON GIRARD, MINOR CHILD GW, and MINOR CHILD GR, | |
| Plaintiffs, | Case No. 1:24-cv-06882 |
| v. | District Judge Rebecca Pallmeyer |
| | Magistrate Jeanine Appenteng |
| VILLAGE OF GLENCOE, ILLINOIS, DETECTIVE RYAN MCENERNEY, MARIA PAREDES, KATHRYN CIESLA ESQ, GWENN WALDMAN, BREANNA TRAUB, BEERMANN LLP, JOHN M. D'ARCO ESQ, JAMES M. QUIGLEY ESQ, ENRICO J. MIRABELLI ESQ, JUDGE WILLIAM S. BOYD, and JUDGE RENEE G. GOLDFARB, | First Amended Complaint and Jury Demand *featuring civil rights, RICO causes* |
| Defendants. | |

Plaintiffs Kenton Girard, in pro se, and the minor children Gw. and Gr., via counsel, for their First Amended Complaint against Defendants **hereby request a trial by jury** pursuant to FRCP 38(b) and allege as follows:

## PRELIMINARY STATEMENT

1.      A custody agreement was approved and entered between Kenton Girard and his ex-wife Jane F. Girard as to their minor children Gw and Gr on November 4 2015. The equilibrium under this agreement started to degrade almost immediately after the ink was dry on the judgment of marital dissolution whereupon Jane F. Girard implemented a pattern and practice

of (a) falsely imprisoning her minor children Gw and Gr inside of bedrooms, bathroom, closets and motor vehicles, and (b) depriving the minor children of food and water for extended periods of hours at a time in order to condition their behavior and their loyalty. Whatever tenuous balance remained was eliminated whereupon Jane F. Girard started sexually abusing her now estranged daughters in early 2021.

2.      As a direct result of those penetrative sexual assaults, the minor children Gw and Gr no longer tolerated spending any time residing at the residence of Jane Girard at 90 Linden Ave in Glencoe and since 2022 have been residing full-time at their father's home at 965 Forestway Drive in Glencoe.

3.      With the minor children estranged, Jane F. Girard turned to Beermann LLP, a previously esteemed family law firm founded by Attorney Miles Beermann which has been taken over by dark forces in the recent decade under which the firm has acquired pervasive and illicit influence over the judges in the Cook County Domestic Relations Division and the proceedings thereunder. Under the engagement, Beermann LLP incepted a new family law pleading against her ex-husband Plaintiff Kenton Girard with the stated purpose of acquiring full custody of her estranged minor children.

4.      In turn, Kenton Girard and his wife Marissa Girard and the minor children Gw and Gr fell victim in what, upon information and belief, amounts to a long and growing chain of Beermann LLP counterparties to be harmed (in numerous vectors: in their business, in their property and personally viz-a-viz the infliction of severe emotional distress) under rigged and highly abusive and excessively papered judicial proceedings resulting from many years of bribery of Cook County family law judges dating back until at least 2016, wherein Domestic

Relations Judge Regina Scannicchio – since 2022 the presiding judge of the entire Domestic Relations Division of Cook County – was on their payroll.

5.      These circumstances are particularly outrageous because the minor children Gw and Gr have been living in a constant state of trauma and distress through the entirety of the underlying family court proceedings facing the very real prospect of being forced by court order to spend regular time in the home of their sex abuser, namely Jane F. Girard.

6.      Moreover, the family court proceedings have dealt a heavy toll on the custom jewelry business which the minor children Gw and Gr they have been growing and operating for the last four years, White Lemon Creations. Because the proceedings have consumed now close to three years in which they have been working on achieving financial stability for the business, Gw and Gr have been hampered by the enormous time commitments of following along and attempting to advocate for their interests.

7.      Those interests have been so grossly inadequately represented by the family law functionaries involved in those proceedings to date, that Gw and Gr have taken to studying the Illinois Code of Civil Procedure and reading voluminous case law and opinions handed down by the Illinois Appellate Court in an attempt to advocate for their interests.

8.      Indeed, Gw and Gr are now capable of writing their own legal papers – an amazing accomplishment for the twin girls who are not yet even seventeen years of age. Besides the original pleading hereunder which was heavily contributed by Gw and Gr, the girls have also authored multiple legal letters to the family law functionaries and the supervising officers of the Cook County court system, as well as a Motion to Intervene[1] in the family court proceedings

---

[1] The Judicial Officer in the underlying family court proceeding heartlessly struck the girls' Motion to Intervene *because they are not represented by a child representative*. Indeed, their previous child representative Joel Levin resigned from his position in August 2024.

where they have been unconscionably left without a voice since August 2024 without any child representative in the case.

9.     Separately, Gw and Gr have been heavily involved in advocating for their interests under a separation emancipation action, currently pending in the Law Division and up on a Motion to Consolidate from Beermann LLP to move that litigation into the underlying family court proceeding where they "own" the judicial officers, from Presiding Judge Scannicchio on down. The whole world knows Gw and Gr are intelligent, hard-working, resourceful and wise beyond their years, yet Beermann LLP's illicit crusade for legal billings in a family court system which they own predominates and suffocates any independent concern for what Gw and Gr wish to make of their fast-developing lives and their fast-growing jewelry business White Lemon Creations.

10.     Beermann LLP has in recent years acquired a reputation as a truly unbeatable foe in the family law courts, owing to its track record of manipulated results before judges it has bribed in exchange for a never-ending flow of favorable rulings. The corruption of Beermann LLP has been quarterbacked by managing partner John M. D'Arco, son of the infamous former Illinois legislator and advocate for the Chicago Outfit John A. D'Arco[2] who was convicted under consecutive indictments in this District in the early 1990s for bribery under Operation GAMBAT and under his sentencing he was remanded to prison and permanently banned from accepting employment in any capacity for any state government in the entire United States.

11.     The scope of the racketeering goes beyond the mere bribing of the family law judges. Upon information and belief, Beermann LLP does not hesitate to barter its power to

---

[2] According to Wikipedia (John D'Arco Sr. - Wikipedia), John D'Arco Sr (the grandfather of Defendant John M. D'Arco) served in the role of First Ward Alderman in which capacity he allegedly advocated for the economic interests of the Chicago Outfit. During the 1970s, D'Arco Sr was investigated federally for his alleged involvement in an attempt to fix the 1977 murder trial of reputed hitman Harry Aleman, but he was never indicted. Additionally, John D'Arco Sr was known by the FBI to be involved in the prostitution and gambling rackets of the Chicago Outfit.

suggest and appoint legal functionaries (child coordinators, custodial evaluators, parental evaluators, child therapists, family reunification therapists, guardians ad litem, and so forth) in exchange for kickbacks and favorable rulings for its clients – padding its legal fees all the while.

12.     In other instances, Beermann LLP does not hesitate to direct personnel outside of the proceedings to undertake extra-judicial maneuvering. Upon information and belief, Beermann LLP calls upon a family law practitioner in the North Shore, Kathryn Ciesla Esq, to negotiate and deliver bribes to local police and family law functionaries located in the North Shore[3] to steer family law proceedings favorably for Beermann LLP and its clientele. Also upon information and belief, another longtime family law practitioner who works downtown, Kurt A Muller Esq, is called upon by Beermann LLP to negotiate and deliver bribes to judicial officers who preside over Domestic Relations courtrooms downtown.

13.     As if the foregoing description were not sufficiently heartbreaking and alarm-raising, under civil standards Jane F. Girard is an admitted sex abuser. To wit: when DCFS opened an investigation into Ms. Girard for a second time on July 22 2023 involving Cook County ASA Mary Stein, Jane F. Girard retained Ms. Jennifer Hansen of Hansen & Cleary LLC in Northbrook as her criminal defense counsel. On September 7 2023, Ms. Hansen informed the DCFS that Jane would be asserting her right against self-incrimination and thus not be making a statement or providing any testimony to the DCFS.

14.     In other words, under principles of judicial estoppel, the underlying family court proceeding in which admitted sex abuser Jane F. Girard seeks a court order of custody as to Gw and Gr should be off the call.

---

[3] The clientele Beermann LLP has acquired in the North Shore account for the vast bulk of its revenues as a firm, because of the intense concentration of wealth in the North Shore. In reflection of this reality, Beermann LLP has an office in Bannockburn.

15.     Incredibly, against this backdrop, the local police have disposed of the criminal investigation of Jane F. Girard as "unfounded"[4] thereby providing a significant roadblock to criminal charges against Jane F. Girard. As will be explored *infra*, Village of Glencoe Detective McEnerney has been largely responsible for perpetuating an unofficial yet pervasive policy of the Village of Glencoe to not properly investigate rapes and sexual assault crimes against women and girls during the period at least since on or around 2019.

### JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law. This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) to redress deprivations "under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States."

17.     The Court has authority to grant injunctive relief pursuant to 42 U.S.C. § 1983 and the Court's inherent equitable powers.

18.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants work and reside in this district. Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this district.

19.     Venue is further proper in this district as to those claims which do not specifically raise federal and constitutional questions under 28 U.S.C. §1367(a).

### PARTIES

20.     **Plaintiff Kenton Girard** is a longtime resident of Glencoe  and the ex-husband

---

[4] This disposition was extremely misaligned with representations by DCFS representative Chundra Brown who in a visit to Plaintiffs' home on or around July 2023 actually stated that felony charges were forthcoming.

of Jane F. Girard, his counterparty in family law proceedings in which she is represented by Beermann LLP. Mr. Girard is the head of real estate for Old National Bank and also has operated a real estate brokerage side business for about twenty (20) years.

21.    **Plaintiff Minor Child Gw** is one of two biological daughters of Kenton Girard.

22.    **Plaintiff Minor Child Gr** is the twin sister of Minor Child Gw. Together they own and operate White Lemon Creations, a custom jewelry business.

23.    **Defendant Village of Glencoe** is a municipality in the North Shore with about 8,000 residents and located wholly within Cook County, Illinois.

24.    **Defendant Detective Ryan McEnerney** works for the department of public safety of the Village of Glencoe as the senior detective of the department with the responsibility for directing investigations and when warranted thereunder subsequently requesting the filing of criminal charges by the States Attorney's Office.

25.    **Defendant Maria Paredes** works for DCFS, the state agency tasked in large part with addressing the safety of children in the State of Illinois, especially pertaining to cases of abuse and neglect. At all times she acted in a supervisory capacity over the case involving the minor children Gw. and Gr. and she is being sued in her personal capacity.

26.    **Defendant Kathryn Ciesla Esq** is an attorney at Ciesla Beeler, LLC in Northfield with a reputation as a "fixer" in the North Shore in relation to complex, contentious and disputed family law proceedings.

27.    **Defendant Gwenn Waldman** is a therapist from Breakthrough Family Solutions appointed to working with both of the minor children Gw. and Gr.

28.     **Defendant Breanna Traub** is a clinical social worker and therapist appointed to working with minor child Gw.

29.     **Defendant Beermann LLP** is a disreputable family law practice which has been alleged of voluminous wrongdoing in Cook County, Illinois.

30.     **Defendant John M. D'Arco Esq** is the managing partner at Beermann LLP and upon information and belief is also a high-ranking member of the Chicago Outfit tasked with overseeing the rackets in the family courts of Cook County, Illinois.

31.     **Defendant James M. Quigley Esq** is an equity partner at Beermann LLP.

32.     **Defendant Enrico J. Mirabelli Esq** is an equity partner at Beermann LLP.

33.     **Defendant Judge William S. Boyd** is an associate judge in the Domestic Relations Division in Cook County, Illinois, and is being sued in his personal capacity.

34.     **Defendant Judge Renee G. Goldfarb** is an associate judge in the Domestic Relations Division in Cook County, Illinois, and is being sued in her personal capacity.

## THE ENTERPRISE GETS SERIOUS ABOUT JUDICIAL BRIBERY

35.     John M. D'Arco was hired as an attorney at Beermann LLP in 2008 by way of another family law firm, Lake Toback. During his early years at Beermann LLP he became very close with fellow Beermann LLP attorneys Enrico Mirabelli and James Quigley, both of whom have also had extensive tenures at the firm.

36.     Upon information and belief, Mr. D'Arco gradually pitched a plan to Mirabelli and Quigley whereby the firm would buy wide-ranging influence across the bench of the Cook County Domestic Relations Division. Critically, they would keep these details very quiet and away from the eyes and ears of the aging founder of the firm Miles Beermann. Mr. D'Arco had

seen the ad hoc workings of judicial bribery during his days at Lake Toback, wherein the payoffs are negotiated and paid on a per case basis, wherein his colleague Kurt A. Muller Esq was a master of the craft.

37. Upon information and belief, Mr. D'Arco strategized there would be less operational risk (and therefore greater scale) if he could rely on a few key judges as reliable "gateways" to deliver bribes to other judges. He also reasoned that he would like to stay above the fray and not personally deliver the bribes (indeed, he had seen his father go to federal prison for bribery in the 1990s), and instead he would instruct and rely on Mirabelli and Quigley to negotiate and deliver the bribes needed.

38. Upon information and belief, Mirabelli and Quigley started to outsource their responsibilities to Kurt A. Muller Esq and Kathryn Ciesla Esq. Thereby a hierarchical structure was established wherein D'Arco provided the leadership from the top, dispensing regular guidance to Mirabelli and Quigley as to allowable amounts and frequency of judicial payoffs as well as rules about how to send bribes to effectively reach specific judges in the Domestic Relations Division through preferred gateway judges. In turn Mirabelli and Quigley did the work personally or through their adopted cut-outs Muller and Ciesla. Incidentally, another Cook County family court victim, Kate Newman, has very vocally criticized Ciesla as making findings and recommendations in her frequent capacity as GAL depending on which party pays her the most. Ms. Newman has specifically levelled accusations that Ms. Ciesla reduced Ms. Newman's share of custody of her children as part of a pay-to-play scheme involving Ms. Newman's ex.

39. As other attorneys at lower rungs of the racketeering enterprise needed payoffs for particular cases, they would communicate those needs to Mirabelli and Quigley. Depending on

the guidance dispensed periodically by D'Arco, Mirabelli and Quigley often had the authority to effect the requested payoffs in the background.

40.    Upon information and belief, Mirabelli and Quigley needed additional in-person channels to deliver the continuously required and growing amounts of cash to keep the racket going. Taking the problem under consideration, John M. D'Arco conceived of the idea to fund a *de minimis* scholarship (thereby incurring *de minimis* cost for Beermann LLP) for African-American law students in honor of (African-American) Judge Boyd sometime after the George Floyd protests in 2020. His idea was to create a pretext to convene regular in-person meetings with Judge Boyd – a completely trusted and reliable "gateway judge" – in order to exercise improper influence over family law proceedings. Upon information and belief, he selected James M. Quigley to be the face of Beermann LLP with respect to administration of the scholarship because Mr. Quigley's wife is African-American.

41.    Upon information and belief, D'Arco and Quigley had a number of in-person meetings outside of their office at Tufano's Vernon Park Tap in the Little Italy neighborhood located at 1073 W. Vernon Park Place during 2020 and 2021 to discuss the idea of Beermann LLP funding the scholarship as a pretext to convene regular in-person meetings with Boyd.

42.    On or around April 2021, the American Academy of Matrimonial Lawyers set up a [scholarship](#) in Boyd's name funded by Beermann LLP: the scholarship committee is chaired by James M. Quigley, a partner at Beermann LLP.[5]  Per the structure of the endowed scholarship, only one *de minimis*[6] award of $5,000 is issued *annually* – in effect, the scholarship is a sham on

---

[5] [Scholarship in Boyd's Name Funded by Beermann LLP](#).
[6] As reported by a [Forbes Article](#) from April 2024: "According to data reported by the Law School Admission Council (LSAC), the average annual cost of tuition for private law school students was $55,963 as of 2023. At public law schools, in-state enrollees paid an average of $30,554 per year, and tuition for out-of-state students averaged $43,590."

its face – to a selected African-American law student who expresses an interest in family law. Quite ironically, Beermann LLP does not employ a single African-American person in its entire roster of attorneys[7].

43.     In the period since the scholarship in Boyd's name was funded by Beermann LLP, upon information and belief, Judge Boyd has had a number of in-person meetings[8] at Petterino's restaurant at 150 N. Dearborn Street with James M. Quigley or Enrico J. Mirabelli a few times per year in which he has accepted envelopes from these attorneys from Beermann LLP containing cash payments in exchange for promising to deliver specifically requested favorable decisions for Beermann LLP clients involved in pending family law proceedings in Cook County. Mirabelli and Quigley have each had at least three (3) such meetings with Judge Boyd at Petterinos since the establishment of the scholarship fund in 2021.

44.     Prior to the establishment of the scholarship, upon information and belief, in the period from 2018 through 2021, one or more subordinates of Judge Boyd have had at least three (3) in-person meetings at Tufano's Vernon Park Tap in the Little Italy neighborhood located at 1073 W. Vernon Park Place with John M. D'Arco in which those subordinates have accepted envelopes containing cash payments in exchange for promising to deliver requested favorable decisions for Beermann LLP clients.

### THE EVIDENCE OF THE BRIBERY KEEPS ACCRUING

45.     By way of confirmation of the systematic bribery taking place, John M. D'Arco is an avid golfer and attends numerous golf outings. For example, he recently golfed at the annual

---

[7] Per the Beermann LLP corporate website as observed on July 31 2024: Attorneys - BEERMANN LLP - Divorce and Family Law in Chicago (beermannlaw.com).

[8] Upon information and belief, these in-person meetings also take place at events convened by the American Academy of Matrimonial Lawyers. Enrico J. Mirabelli and James M. Quigley are pictured together with Judge Boyd and his wife at another event hosted by the American Academy of Matrimonial Lawyers in April 2023: https://aaml-illinois.org/events-2022/

outing for the National Italian American Sports Hall of Fame in August 2024. He also frequents golf courses in the Hinsdale area – including without limitation the LaGrange Country Club – where certain of his family members reside. On various such summertime golf outings in the Hinsdale area from 2018 through 2024, he has been overheard bragging alternatively (a) that he "owned" various of the family law judges in Cook County, and (b) that various family law judges in Cook County were on his payroll.

46.     Mr. D'Arco has also attended annual golf outings for St Ignatius College Prep in the last two years, wherein the most recent such outing was at Cog Hill Golf and Country Club in LeMont. Members of the Classes of 1996 overheard Mr. D'Arco being asked about the cost of representation for a planned divorce, to which D'Arco said a number, qualifying that that is the price for "certainty", thereby invoking the spectre of judicial bribery.

47.     Serving as a window to the truth, after the filing of the original complaint hereunder, Beermann senior partner Beth McCormack Esq told her friend from the North Shore that the "Girard lawsuit" is extremely serious and there was a mole hunt going on at the firm to try to silence the obvious leaker of information about Beermann internal affairs.

48.     At a hair salon in the River North area, one of the stylists has in the recent few months been recounting a story that a few of the Beermann attorneys who regularly patronize the salon have expressed significant fear that there is a mole in their firm, possibly a cooperating witness working for the FBI.

49.     A Beermann counterparty in another proceeding, Jackie Sample, has been interviewed by investigative journalist Michael Volpe about irregularities in her case on a number of occasions in the past year or so. Recently, Mr. Volpe published a video interview of Jackie Sample in which she asserted that the landscape of rulings in her case smacks of judicial

bribery also. See https://www.youtube.com/watch?v=3zbh7hUn0es entitled "**Is Beermann Law Group bribing judges: An Interview with Jackie Sample**".

50.     Approximately two years ago, Jackie Sample was at the offices of The Muller Firm Ltd located at 110 W. Grand Ave. She was there in a meeting with Attorney Kurt A. Muller, to discuss whether The Muller Firm might consider entering an appearance on her behalf in her family law proceeding in which her ex was represented by Beermann LLP. During this meeting, Attorney Muller had to answer a telephone call. She overheard Attorney Muller engage in discussion on speakerphone with Defendant Judge William S. Boyd. In that call, Judge Boyd directly solicited a monetary bribe to render favorable decisions for an unspecified client in an unrelated family court proceeding. After the telephone call was completed, and continuing with the intake meeting, Jackie Sample disclosed to Attorney Muller that she was up against Beermann LLP. At that point, Attorney Muller told her that unfortunately his law firm would not be able to represent her owing to conflicts of interest and the meeting ended.

51.     Shortly after the Michael Volpe video interview aired on YouTube, Jackie Sample communicated her intent to pursue claims against Beermann LLP for fixing the family law proceeding involving her ex, Dr. Madison Sample before Associate Judge James D. Orel in DuPage County. Shortly thereafter, Beermann LLP filed a motion to withdraw from its representation of Dr. Madison Sample and Judge James D. Orel simultaneously announced his retirement[9] in what constitutes a seeming admission as to bribes being exchanged between Beermann LLP and James D. Orel[10].

52.     In another family law proceeding in Cook County before Judge Regina

---

[9] Indeed the 18th Judicial Circuit Court issued a press release on November 15 2024 that Associate Judge James D. Orel would be retiring effective December 31 2024.

[10] Incidentally, this recent event with James D. Orel suggests that the racketeering enterprise has expanded its scope beyond the initial target of the Cook County Domestic Relations Division to now encompass judges in other counties including without limitation DuPage County.

Scannicchio, a Cook County Resident Leann Stevens engaged Beermann LLP attorney Jonathan Steele in her domestic relations proceeding. Judge Scannicchio had a well-known reputation as being hard on women before her in her court. However, quixotically, when Leann Stevens was discussing case strategy with Attorney Steele at the onset of the representation on or around 2016, he remarked "Oh, we have Scannicchio – we are good!" Attorney Steele knew that the outcome was preordained: Judge Scannicchio would tender all rulings in his favor during the proceeding because she was on the payroll of Beermann LLP.

53.     Incidentally, Judge Scannichio was promoted to presiding judge of the Domestic Relations division of Cook County in September 2022 by Cook County Chief Judge Timothy Evans. The idea that she was on the payroll of Beermann LLP since at least on or around 2015 is downright frightening[11] as to the improper influence Beermann LLP *now wields over all family court proceedings* in Cook County.

54.     Similar to the shady circumstances of the scholarship established in the name of Judge Boyd, Judge Scannicchio is the 2022 recipient of the Judge Samuel S. Berger Award, given by the American Academy of Matrimonial Lawyers. Upon information and belief, one of the illicit purposes of the various awards bestowed by the American Academy of Matrimonial Lawyers (in specific, the Illinois Chapter thereof) is to create a legitimate reason to convene in-person meetings between attorney practitioners and the judges assigned to the family courts. Such meetings allow for frank *quid pro quo* conversations and transactions which would normally risk the threat of exposure under normal daily circumstances.

55.     Following this pattern, on August 27 2022 aboard the marine vessel "Anita Dee

---

[11] Incidentally, during a tense moment in the representation of Leann Stevens by Beermann LLP involving an emergency hearing, Justino Mirabelli – the son of Enrico Mirabelli – threatened Leann Stevens to say nothing but positive things about the history of the legal services provided to her by Beermann LLP. She left such encounter downright frightened not only for her case but for her life.

II" moored at DuSable Harbor, Judge Regina Scannicchio was being honored for her promotion by Cook County Chief Judge Timothy Evans to presiding over the entire Domestic Relations division of Cook County. At this nighttime gala, upon information and belief, Enrico Mirabelli delivered an envelope containing cash to Judge Boyd who was also present.

56.     Enrico Mirabelli just today displayed an unscripted moment of candor which speaks volumes as to the ingrained nature of the bribery at Beermann LLP. To wit, on December 6 2024 in preparation for an upcoming hearing on Substitution of Judge directed at the current judicial officer presiding over the family court proceedings, Enrico J. Mirabelli took it upon himself to ask Jaime Barcas of the office of the Presiding Judge Scannicchio **"Please just let us know which Judge will be hearing the motion"** – presumably so he can arrange for a judicial payoff to ensure the outcome of the upcoming hearing is favorable to Beermann LLP.

### CLIENTS WHO SPURNED BEERMANN ALSO HAVE TALES TO TELL

57.     On or around February 2020, a member of the Illinois Bar residing in Glencoe contacted Beermann LLP to discuss the possibility of their assistance in a contemplated divorce from her husband. This member of the Illinois Bar was asked very detailed questions about her spouse's background, profession, assets and financial condition.

58.     Once the attorney taking the call at Beermann LLP flagged the case as an apparent high net worth scenario, after a few moments, Mr. Mirabelli connected and took over the telephone call. Without prompting, Mr. Mirabelli bragged that his firm would get her 100% full custody of their children and dissipate all of her husband's assets, leaving him totally dry, in fact would get "whatever her heart desired".

59.     The prospective client commented that she was only contemplating mediation and the construction of an agreed order as to marital dissolution to be filed with the court. However,

Mr. Mirabelli was very insistent that such a course of action "would not result in a great outcome" and that it would be best for her to sign a retainer (absolutely zero payment required – all fees would be turned over from her husband during the course of the proceeding) *that very evening* and they would file the petition for dissolution *no later than the following morning*.

60.     Mr. Mirabelli remarked that "mediation never works, it is a waste of time and money". He insisted it would be best to not second-guess the feelings which prompted her call to Beermann LLP that day. The prospective client complained of obvious ethical and legal problems with what Mr. Mirabelli was proposing and ended the call. Beermann LLP continued to hound her to pitch her on filing a petition for marital dissolution for the ensuing period of several months.

61.     The above-referenced attorney from Glencoe shared the story with some of her friends and colleagues, one of whom also from the North Shore posed as a Tester[12] and placed a call from an untraceable VOIP telephone number to Beermann LLP on or around June 2020. The so-called Tester experienced virtually an identical reaction. In an uncanny similarity, the Tester was asked about her husband's job and assets, bank account balances and within a minute Attorney James Quigley took over the telephone call promising the caller Beermann LLP would work hard to get her full custody of the children and dissipate all of her husband's assets.

62.     The Tester proceeded to question how Beermann LLP would live up to that promise, and Mr. Quigley told her not to worry about the tricks of the trade, everything would resolve as promised. The Tester proceeded to object stating she wanted a low-conflict situation and to just prepare a mutually agreed divorce order through mediation.

---

[12] Two paradigmatic examples include (a) "Tester Plaintiffs" lodge a telephone call to an establishment to inquire about handicapped persons accommodations, fishing for potential claims under the Americans with Disabilities Act, and (b) "Tester Plaintiffs" place a call to a landlord asking if African-American persons are welcomed as prospective tenants, fishing for potential claims under civil rights laws.

63.     Mr. Quigley vigorously objected, admonishing the Tester that mediation "never worked" and it would be best to give her spouse what he deserved - an uncomfortable proceeding in the court with all of the trimmings. Mr. Quigley similarly offered a zero dollar retainer and indicated all attorneys fees would be obtained from her husband. He pressured her to sign the retainer that very day with a plan to file the petition for marital dissolution immediately thereafter, within 24 hours.

64.     Included in our Beermann LLP docket data (see *infra* at pp. 24-26), the family law proceeding involving Szymulanski (Cook County Case No. 2021D008999) had all the hallmarks of the Beermann LLP modus operandi. In that proceeding, the wife hired Beermann LLP wherein they shotgunned a petition for marital dissolution immediately after the retainer was executed in lieu of making a good faith effort under mediation. Numerous settlement offers from her spouse were roundly rejected, and her spouse went through multiple law firms each complaining of the unfairness of the playing field with Beermann LLP on the other side, including commentary that Beermann had influence with the judges.

65.     Fully **twelve motions for fees** were filed by Beermann LLP against her spouse seeking in excess of $600,000 in aggregate. Near the onset of the proceedings, Attorney James Quigley instructed the wife to set up a high conflict situation at home, wherein her spouse – a prominent tax attorney and partner at Croke Fairchild Duarte & Beres LLC – became extremely agitated during a high-stress period when he was tackling a pile of paperwork. Quigley had the Glencoe Department of Public Safety rush to the scene and arrest the spouse on suspicion of domestic violence.

66.     The charges did not move forward, but a plenary order of protection was granted and the court was highly prejudiced against her spouse for the balance of the inherently

high-conflict family court proceeding. Incidentally, Gwenn Waldman was an appointed family law functionary in that proceeding wherein she propounded decisions and recommendations in all instances favorable to Beermann LLP's client, similar to the instant situation as in Plaintiffs' underlying family court proceeding.

67.     In another family law proceeding in Cook County, a female resident Cassie Hezinger Drost of Barrington met with Enrico Mirabelli who promised that Beermann LLP would get her primary if not sole custody and "every last penny belonging to her spouse". Excited by Mr. Mirabelli's sales pitch, she hired Beermann LLP and the firm proceeded to burn through a $10,000 retainer in less than two weeks. Because Ms. Drost perceived that Mr. Mirabelli provided no value whatsoever on her retainer, and she had doubts about his initial sales pitch, she fired Beermann LLP.

68.     Subsequently her proceeding was presided over by Judges Boyd and Goldfarb, as here, and Joel Levin was the appointed child representative (also as here). Among other egregious details from that proceeding, Cassie's ex flipped a car with the children inside in a one-car accident, and it started on fire with the children inside the vehicle. The ex had documented alcohol abuse issues and operating under the influence would appear to be the likely cause, although there was no citation issued for that crash.

69.     Despite clear red flags about his temperament (Cassie's ex had been previously convicted of sexual assault of another woman during the marriage) and his documented incapacity to take care of the children, Cassie's ex was granted primary custody of the children against expert opinions rendered in that proceeding. Cassie believes she is experiencing retaliation as a result of firing Mirabelli, which is credible given that Boyd, Goldfarb and Levin are collectively "owned" by Beerman LLP.

70. Another North Shore resident Karmen Andrews consulted with Defendant John M. D'Arco about her family law case in 2023. During the consultation, Karmen disclosed a vast amount of highly confidential and privileged information about her case. Mr. D'Arco promised her that Beermann LLP would get her primary custody and all of her spouse's assets. After a lengthy intake meeting, Attorney D'Arco requested payment of a $10,000 retainer to enter his appearance on her behalf.

71. Karmen replied that she needed to think it over, in primary part because she felt that what Mr. D'Arco was promising smacked of a sleazy sales pitch and a scam. Ultimately, she did not hire Attorney D'Arco and some weeks later Beermann LLP entered its appearance on behalf of her spouse. Such an appearance for her spouse, after Karmen had divulged confidential information, constitutes a serious breach of ethical duties and an obvious conflict of interest.

72. After spurning D'Arco and Beermann LLP, Karmen Andrews' proceeding has turned into an unbelievable nightmare. Her sons have been ordered to primary custody by her ex and upon information and belief have been physically and sexually abused in his care, as a result of which one of the sons has developed both homicidal and suicidal proclivity.

73. Karmen's counsel in that proceeding has noted that "the parties have been forced to keep a temporary custody schedule which has expired, and the children have not been allowed to return to their mother's home." Similar to the situation with Cassie Drost, it seems the invisible hand of Beermann LLP has puppeteered an incredibly adverse situation in her proceedings as retaliation for in this instance spurning John M. D'Arco's proverbial "offer you cannot refuse."[13]

_____

[13] This is the best-known line from The Godfather book (1969) and film (1972), both written by Mario Puzo. In The Godfather, there are three different instances in which a character repeats the line about the offer one can't refuse. The first time Vito Corleone uses the phrase, it is to his godson, Johnny Fontane. Fontane approaches Vito for help in securing a movie role and Vito assures he'll give the

## TINA SAMUELS' WINDOW INTO JUDGE BOYD'S COURTROOM

74. Along the same lines, another victim of the Cook County family court system, Tina Samuels, has described a campaign of horrors which was waged against her wherein Judges Boyd and Goldfarb presiding over her matter during the period from 2016 - 2019. Tina's ex at the time had an extensive rap sheet with numerous arrests for suspicion of battery and domestic violence, although much of his record is now expunged or sealed.

75. Prior to the inception of the proceedings, Tina lodged numerous documented Domestic Violence Hotline telephone calls, and she also had several documented Domestic Violence shelter stays. During the proceeding, Tina made four (4) separate applications for orders of protection and in her words "Boyd and Goldfarb worked together as a tag team" and rendered favorable rulings for her ex at every turn.

76. Child therapist Dr. George Smith submitted formal custody recommendations to Judge Boyd, who flatly refused to adopt his findings. Similarly the findings contained in 604(b) evaluator Dr. Alexander Paret's formal report *were not implemented*. Once Judge Boyd gave Tina's ex custody, the kids began to exhibit symptoms of unsupervised care: third degree burns, busted lips, black eyes, bruises, abrasion, gashes in heads, etc all documented. Everything went as threatened by her ex, who warned at the outset that Tina would not see her children *because his sister Laurie Samuels had connections in the Cook County courts*.

77. Each of Tina's several attorneys who entered appearances on her behalf *were cautioned to not zealously advocate for Tina*. Veteran Attorney David Daudell was told it would be best if a junior attorney from his firm handled the proceedings. Attorney Shimberg advised

---

studio chief an offer he can't refuse, forcing him to cast Fontane. Initially, the studio chief stands his ground when Vito's consigliere pressures him to cast Fontane. However, when the executive awakens to find the severed head of his most prized stallion in his bed, he relents and gives Fontane the role.

Tina Judge Boyd was clearly paid off to make things adverse for Tina and she should consider exfiltrating her children to Canada. Attorney Sheala Rubio was warned off the record in Judge Boyd's chambers that she would be sanctioned if she presented documentation of the children's injuries sustained in the custody of Tina's ex. Attorney Vivian Tarver Varnado was similarly warned by Judge Boyd in his chambers against presenting documentation of the injuries.

78.     After her proceedings were off the call, one of the attorneys for her ex met up with her after court in 2019. Attorney Lucy Vazquez-Gonzalez confessed to her that Attorney Edmonds on her ex's legal team was college buddies with Judge Boyd and that *he had recounted paying Judge Boyd a bribe to make the case go smoothly*.

79.     It is worth noting that Beermann LLP represented Dwayne Wade around 2019 during custody proceedings. Those proceedings were notably presided over by Judges Boyd and Goldfarb, and Enrico J. Mirabelli (who is "in with Boyd" – see *infra* at p. 33) played a starring role on Mr. Wade's legal team. The nexus between Judge Boyd and Mr. Mirabelli is a robust one going back to at least 2019. Among other important lessons which arise from the Tina Samuels story is that Judge Boyd has been available for purchase since at least 2016, and Beermann LLP is not the only law firm which has been greasing the wheels of justice.

## THE BEERMANN MOTION FOR FEES PLAYBOOK

80.     In the anatomy of a Beermann LLP family law proceeding the usual presentation as substantially demonstrated *supra* includes:

(a) luring of prospective clientele by promising majority custody and egregious dissipation of the spouse's assets,

(b) rejection of mediation and settlement to keep the legal billings accruing,

(c) pushing the clients to report domestic violence or harassment related grievances

against their domestic relations counterparties (sometimes effectuating bribes to persuade the police to make an arrest or even to recommend criminal charges),

(d) placing for approval by the court friendly family law functionaries who will make findings and recommendations consistently favorable[14] to Beermann LLP and its client,

(e) maintain high-conflict dynamics naturally accompanied by the excessive filing of court papers, and

(f) the filing of multiple motions for grossly excessive attorneys fees against the spouse, incurred under artificially long proceedings under bribed judges.

81.     As further evidence of the excessive "papering" of the proceedings, an inordinate number of legal professionals (in many cases 8-12 separate attorneys) work on behalf of the clients for the express purpose of generating wildly inflated and flatly unnecessary billings. For the sake of counting predicate acts, Mr. Quigley conducted the playbook under *Szymulanski* and *Burkholder* and *Shah*, while Mr. D'Arco conducted the playbook under *Paulish* and *Gamsjaeger*, while Mr. Mirabelli conducted the playbook in the underlying family law proceedings and under *Dobrowolski*. Numerous other instances of Mr. D'Arco, Mr. Mirabelli and Mr. Quigley conducting the playbook are adduced *infra* in the itemization of proceedings included at pp. 24-26.

## MAKING STATISTICAL SENSE OF THE PATTERN OF RACKETEERING

82.     As described *supra*, we have adduced numerous predicate acts of bribery and numerous predicate acts consisting in violation of the Hobbs Act codified under 18 U.S.C. § 1951. While the instances of bribery do not attach directly to specific numbered proceedings in

---

[14] Naturally, for their loyalty and dependability as to favorable findings and recommendations for Beermann LLP and its clientele, these favored family law functionaries inevitably engage in wanton and excess billing as a form of kickback or consideration for those findings.

the family courts, the Hobbs Act violations do arise from particular family court proceedings. We have the following excerpt of predicate acts.

| Type of Predicate | Description | Description/Victim | Offender Name(s) |
|---|---|---|---|
| bribery | Cash to Judge Boyd | 2021 Petterinos | Mirabelli |
| bribery | Cash to Judge Boyd | 2022 Petterinos | Mirabelli |
| bribery | Cash to Judge Boyd | 2023 Petterinos | Mirabelli |
| bribery | Cash to Judge Boyd | 2021 Petterinos | Quigley |
| bribery | Cash to Judge Boyd | 2022 Petterinos | Mirabelli |
| bribery | Cash to Judge Boyd | 2023 Petterinos | Quigley |
| bribery | Cash to Judge Boyd | 8/27/2022, Anita Dee | Mirabelli |
| Hobbs Act | Beermann Playbook | Plaintiffs | Mirabelli |
| Hobbs Act | Beermann Playbook | Szymulanski, *infra* | Beermann LLP |
| Hobbs Act | Beermann Playbook | Burkholder, *infra* | Beermann LLP |
| Hobbs Act | Beermann Playbook | Duckman, *infra* | Beermann LLP |
| Hobbs Act | Beermann Playbook | Mintzer, *infra* | Beermann LLP |
| Hobbs Act | Beermann Playbook | Paulish, *infra* | Beermann LLP |

83.     From the preliminary analysis we have performed in constructing this pleading, the injuries are varied, affecting at least fifty-four (54) separate victims (from case descriptions offered *supra* and table of cases itemized *infra*) from non-overlapping, distinct schemes perpetrated by Beermann LLP experiencing in all cases damage to property (excess extortionate fees in violation of the Hobbs Act where the Beerman Motion for Fees Playbook is implemented), often damage to business and personal injury including emotional distress. Further research, investigation and discovery powers will certainly open this up and give a better

sense of the true immense scale of carnage of victims under the long-lasting pattern of racketeering conducted by D'Arco, Mirabelli and Quigley.

84.     Examination of forty (40) random family law proceedings in Cook County in which Beermann LLP has represented one of the parties has revealed that in **92%** of such proceedings Beermann LLP has propounded at least one motion[15] for attorneys fees separate and apart from the praecipe for outstanding fees owing which accompanies entry of judgment.

85.     On average, per this examination, Beermann LLP propounds 2.5 motions for fees per proceeding not counting the praecipe. *Such numbers constitute absolutely stunning statistics* because for the vast majority of the sample tested the inceptive date of the proceeding is not more than four years ago.

86.     Post-decree proceedings can linger for a decade or more (as evidenced by Gentile, Par and Johnsson in the sampled data). Accounting for the time remaining on the clock, chances are the average number of motions for fees for this very sample will be much higher in five years and the hit rate will likely be much closer to 100%. This empirical pattern speaks volumes in support of the prevalence of the *Beermann Motion for Fees Playbook.*

87.     A tabulation of this random inspection of Beermann LLP family law proceedings in Cook County follows, wherein case numbers for the proceedings as well as petitioner's last name and date of inception are noted, together with dates of Beermann's motions for fees per proceeding.

| CASE NUMBER | PETITIONER | FILED | BEERMANN MOTIONS FOR FEES* |
|---|---|---|---|
| 2015D009633 | Girard | 10/20/15 | 11/6/23, 10/18/24** |
| 2020D001338 | Dean | 02/13/20 | 3/20/23 |

---

[15] Such requests are variably labeled as a "motion", or a "petition" or a "rule to show cause" etc.

| 2022D007480 | Dobrowolski | 9/21/22 | 2/20/24, 5/17/24, 7/16/24 |
|---|---|---|---|
| 2009D011400 | Mintzer | 12/14/09 | 9/23/21,1/18/2, 2/1/22 |
| 2010D530906 | Gentile | 12/30/10 | 1/13/15, 2/19/19 |
| 2011D002375 | Par | 3/10/11 | 8/12/14, 7/28/21 |
| 2011D002738 | Johnsson | 3/18/11 | 8/7/14, 8/11/22 |
| 2014D008130 | Topalovich | 8/4/14 | 2/3/20, 10/13/20, 9/15/23, 9/23/24 |
| 2015D001383 | Griffin | 2/18/15 | 6/29/21, 2/25/22 |
| 2016D007956 | Paulish | 8/26/16 | 10/17/18, 5/17/23, 1/26/24 |
| 2021D002484 | Gamsjaeger | 3/24/21 | 2/16/22, 3/8/24 |
| 2021D002630 | Schwartz | 3/29/21 | 7/23/24 |
| 2021D008226 | Tyler | 9/23/21 | 12/20/21 |
| 2021D009225 | Lara | 10/25/21 | 6/21/24 |
| 2021D009833 | Tunney | 11/12/21 | 6/10/24 |
| 2022D001567 | Johnson | 2/28/22 | 6/24/24, 11/22/24 |
| 2020D003083 | Burkholder | 5/7/20 | 2/22/22, 3/8/22, 8/1/22, 11/17/22, 2/1/23 |
| 2020D006103 | Shah | 9/3/20 | 2/16/22, 8/9/22, 3/29/23, 4/21/23 |
| 2021D006964 | Samaniego-Skylas | 8/10/21 | 7/18/22, 11/22/22 |
| 2021D008999 | Szymulanski | 10/15/21 | 5/19/22, 3/13/23, 6/21/23, 11/14/23, 1/26/24, 2/5/24, |
| | | | 2/28/24, 3/20/24, 3/27/24, 5/30/24, 6/10/24, 9/23/24 |
| 2022D003274 | Funderbunk | 4/22/22 | 7/11/22 |
| 2022D004198 | Buss | 5/26/22 | 7/25/23 |
| 2022D004652 | Leonard | 6/13/22 | 10/27/23, 7/17/24 |
| 2023D006805 | Collins | 8/30/23 | 9/21/23 |
| 2023D008887 | Talarico | 11/13/23 | 5/15/24 |
| 2024D002817 | Kozlowski | 4/15/24 | 8/1/24 |

| CASE NUMBER | PETITIONER | FILED | BEERMANN MOTIONS FOR FEES* |
|---|---|---|---|
| 2023D006483 | MacMillan | 8/18/23 | 3/20/24, 4/22/24, 7/24/24 |

| 2022D002732 | Duckman | 4/5/22 | 12/28/22, 2/2/23, 4/26/24, 7/31/24, 8/20/24 |
| 2022D005505 | Kukadia | 7/14/22 | 5/25/23, 5/29/24 |
| 2022D008019 | Ennis | 10/11/22 | 11/2/22 |
| 2023D001284 | Pfaff | 2/16/23 | 12/4/23, 12/21/23, 1/16/24 |
| 2024D002754 | Cohen | 4/12/24 | 7/18/24, 11/7/24 |
| 2022D009505 | Sabel | 12/6/22 | 10/1/24 |
| 2021D000217 | Phelan | 1/11/21 | 8/9/21, 8/19/22, 10/12/22 |
| 2022D001981 | Hartman | 3/11/22 | 4/15/24, 5/10/24, 7/18/24 |
| 2022D004923 | Diamond | 6/22/22 | 12/13/23, 5/20/24 |
| 2024D079170 | Arias | 2/8/24 | 5/3/24 |

\* The fee request is typically adduced in a self-described motion, petition or rule to show cause; requests for final assessment of fees post-decree are specifically not included in this itemization.
\*\* Indicates a fee motion was pronounced as forthcoming on the inscribed date.

### THE RICO ENTERPRISE AND THE PREDICATE ACTS

88.     The RICO enterprise is a corporate entity and an association-in-fact enterprise that consists of Beermann LLP, its managing partner John M. D'Arco, James M. Quigley, Enrico J. Maribelli and various professionals at the firm. The enterprise is led by John M. D'Arco, who is the mastermind of the firm's strategy to illicitly "buy" family law judges in Cook County, Illinois and then profit from extravagant and unnecessary fee billings in family law proceedings approved by the judges which have been bribed.

89.     The predicate acts involved include (a) bribery, in the form of handing envelopes of cash to Judge Boyd and other "gateway" judges, and (b) violations of the Hobbs Act, manifesting 1:1 with family court proceedings wherein the Beerman Motion for Fees Playbook has been followed. Other firm professionals are involved in these bribery schemes, by virtue of their involvement in matrimonial law associations and other professional associations.

90. To ensure continued recoveries, the Beermann Defendants have developed and implemented a modus operandi – the "Beermann Motion for Fees Playbook" – that crosses all objective legal and ethical boundaries.

91. The Beermann Defendants, including lawyers, family law functionaries, experts judges, outside counsel and others constitute a quintessential RICO enterprise. The enterprise is highly structured. Everyone has a role to play, and they all work towards the same goal: favorable rulings for Beermann clients and prolonged high-conflict proceedings, leading to maximization of recovery of legal fees, settlements and judicial dispositions through a pattern of unlawful conduct, including racketeering activity.

92. In the context of any one case and in the heat of litigation, the pattern remains hidden under the veil of aggressive litigation or excessive filings of motions and papers. But the number of times the elements of the firm's scheme have arisen in its cases in the Cook County family courts demonstrate that Beermann LLP has a well-developed plan to extract money from Plaintiffs through a long-running pattern and practice of implementing the Beermann Motion for Fees Playbook.

93. The Beermann Defendants' conduct goes well past routine litigation activity and is actionable. Here, the Plaintiffs do not seek to re-litigate any past litigation or challenge the validity of any state court judgment. This case, instead, seeks to hold the Beermann Defendants accountable for a series of illegal and tortious acts to maximize attorneys fees, settlements and judicial dispositions and litigation results at the expense of Plaintiffs.

94. This unlawful conduct caused Plaintiffs to incur significant fees (dissipating property to which Beermann LLP has not rightful claim) and has caused significant damages to Plaintiffs' business activities.

95.     Beermann LLP advances many sham and unnecessary or unreasonable papers during family court proceedings specifically calculated to enrich themselves, at the expense of their clients and counterparties. They have engaged in that scheme at the expense of Plaintiff and many other counterparties arising in the Domestic Relations docket of Cook County, and there is evidence they are engaged in such schemes in other counties as well e.g. DuPage County.

96.     The Beermann offensive in the family courts of Cook County has not just impacted Plaintiffs. It has drained resources that could have been otherwise legitimately used by families to encourage and assist their children, increased the likelihood of or contributed to the bankruptcy of many residents of Cook County, damaged others' careers and prospects sometimes via sham criminal proceedings, generally impacting many people's jobs and retirements, and wasted judicial resources. As demonstrated by the plethora of examples included *supra*, the Beermann Motion for Fees Playbook still is being used in the Cook County family courts and will continue to inflict harm unless it is stopped.

97.     The implementation of the Beerman Motion for Fees Playbook reasonably contemplated and depended on ubiquitous use of interstate mail and wires, including emails, video conferencing technology, telephone, electronic filing systems for filing of court documents over the internet, electronic service systems that transmitted discovery and court filings over the internet, and interstate mail and wires to otherwise further the scheme.

98.     Beermann's scheme involves the litigation of unnecessary and irrelevant motions and papers, the creation of high-conflict situations all geared towards the penultimate and jacked up aggregate sum of fees which is their object.

99.     Indeed, Beermann Attorney Molly Carmody Esq recognized the nature of the firm's outrageous, unlawful and unethical conduct over the course of the years when she worked

at the firm was not a normal part of the employment relationship, and at that point she resigned her position last year.The misconduct, instead, went well beyond routine litigation activity.

100.    The pattern of racketeering described in this complaint has been a long-running scheme of the Beermann Defendants. The scheme is interstate in scope, wherein D'Arco and Mirabelli primarily operate the scheme from Florida, while other family law functionaries operate the scheme from *inter alia* Illinois, Arizona and Texas.

101.    The implementation of the Beermann Motion for Fees Playbook reasonably contemplated and depended on ubiquitous use of interstate mail and wires, including emails, video conferencing technology, telephone, electronic filing systems for filing of court documents over the internet, electronic service systems that transmitted discovery and court filings over the internet, and interstate mail and wires to otherwise further the scheme.

102.    The typical sales pitch extended to prospective female clientele (who are seeking asset divisions or custodial rights) is that the firm "can do anything… we will get every last penny from your husband and full custody of the children." On its face, such a sales pitch smacks of extra-judicial manipulation, for how can a law firm assure any desired outcome irrespective of the merits without having pre-ordained control over the results of the underlying legal proceedings.

103.    The primary objective of the RICO enterprise is to secure the most compensation possible for clients and fees for the firm regardless of its active role in corrupting the fair administration of justice in the family law courts in Cook County, Illinois. Family law actions filed by Beerman LLP often specifically target high-net worth individuals, and affirmatively include actions targeting fathers residing in Florida, New York, California and Arizona.

104.     The implementation of the Beermann Motion for Fees Playbook constitutes a wrongful quest for property, *as to the excess fees* generated by the unnecessary, unreasonable motions and papers which are amicably allowed by bribed judicial officers.

105.     The schemes in play follow a similar template: buy the judges, obtain the loyalty of the court-appointed personnel and experts who know that they can bill unreasonably in a Beermann LLP-controlled courtroom, task an inordinate number of attorneys to the case to generate maximum fee billings and the monies will flow into the coffers of Beermann LLP.

106.     As one expert repeatedly utilized by Beermann LLP and hired by Beermann LLP partner Jared Pinkus recently revealed during a recent deposition, results in court were always favorable to Beermann LLP clientele regardless of the merits.

107.     The illicit bribes of family law judges by Beermann LLP and orchestrated by John M. D'Arco, as negotiated and implemented by Maribelli and Quigley (sometimes using their presumptive cutouts Kurt A. Muller and Kathryn Ciesla) are not isolated incidents, but part of a broad and continuing pattern. Similarly the Beermann Motion for Fees Playbook is broadly and pervasively implemented in the vast majority of Beermann's Domestic Relations proceedings, to the point where the docket of a Beermann case from a high level looks like a "copy paste" of the others.

108.     Unlike RICO theories predicated on common law fraud, which are often deemed insufficient under the law owing to the high burden of proof associated with common law fraud, the scheme here is much more bold and is founded on outrageous and repeated acts of bribery and Hobbs Act violations resting on the theory of extortion. Neither bribery not extortion implicates fraud or deception.

109.     Here, John M. D'Arco, James M. Quigley and Enrico J. Mirabelli (and the

presumptive cutouts Kurt A. Muller and Kathryn Ciesla) are each directly involved in predicate acts. Put simply, these individuals not only knew about, agreed to participate in, and participated in the bribery scheme, they were each in part responsible for orchestrating the scheme as it involved the actions of other professionals in the family law industry, and in the legal world.

110. From another point of view, it appears that D'Arco is continuing the documented family business of bribery, as conducted by his father and grandfather before him.

111. Other individuals personally involved in the scheme include (a) appointable family law proceeding functionaries including child coordinators, custodial evaluators, parental evaluators, child therapists, family reunification therapists, guardians ad litem, and so forth; (b) outside lawyers such as Kathryn Ciesla Esq directed to engage in extra-judicial maneuvering to illicitly obtain advantage over opposing parties, and (c) local police departments who are directed – or in some cases provided illicit consideration such as cash payments – to launch criminal investigations and even to recommend criminal charges.

112. All of these individuals are directed by Beermann LLP to work in furtherance of favorable decisions and outcomes for their clients, and thereby increase fee billings for Beermann LLP and virtually always recovery from counterparties under motions for fees.

113. The scheme has included dozens of predicate acts over the course of the last decade, many of which are described in the preceding paragraphs. The primary predicate acts that form the basis of the racketeering activity are instances of bribery.

114. Plaintiffs do not have access to all of the evidence showing how all of the bribes were effectuated but can identify specific overt acts were part of the scheme to demonstrate the frequency and long-running duration of predicate acts. This is not an exhaustive list of predicate acts, but provides examples of predicate acts currently known to Plaintiffs.

115. The above-enumerated details of the bribery scheme are more than sufficient to establish the RICO enterprise, its goals and members, and how it worked, involving thousands of interstate mails and wires sent by Beermann LLP professionals in furtherance of the scheme.

116. Defendants Beermann, D'Arco, Quigley and Mirabelli are in the exclusive possession or have exclusive knowledge of many interstate mails and wires that were part of the scheme. Discovery will reveal these additional predicate acts. Beermann Attorney Jonathan Steele as noted *supra* also has material knowledge of the bribery of Judge Scannicchio.

117. The following are examples of certain interstate mails and wires sent as part of the scheme to extract excessive fee billings from family law proceedings before Beermann LLP bribed judges: (a) subpoenas sent to to out-of-state financial institutions, (b) discovery propounded in certain of the family law proceedings to parties residing in California, New York, Florida and Arizona, (c) email messages sent using the interstate wires by Enrico J. Maribelli (who operates substantially out of Florida) and the various family law functionaries involved in nearly all of such family law proceedings. For example, in the Girard family law proceeding, numerous email messages were sent using the interstate wires by the guardian ad litem Vanessa Hammer (who operates her business substantially out of Texas), by the successor child representative Joel Levin (who operates his business substantially out of Arizona), by the court-appointed therapists Gwenn Waldman and Breanna Traub, and by the 604(b) evaluator Phyllis Amabile MD.

118. These are just some examples of the interstate mails and wire used by Defendants Beermann LLP and John M. D'Arco.

## HOW PLAINTIFFS HAVE BEEN HARMED BY THE RACKETEERING

119.    Mediation[16] as to the custody arrangement between Kenton Girard and Jane F. Girard took place on or around June 2022. The mediator, Lisa Ruble Murphy, a retired Cook County judge, told Kenton that she advised Jane to accept custody of Gw and Gr every other weekend, and based upon her in-person meetings in which Gw and Gr had indicated there was no way they would be spending time during the week in their freshman year at Jane F. Girard's house of horrors.

120.    Attorney Karen V. Paige encouraged Jane F. Girard to seek full custody instead via a full-blown court proceeding, in a page out of the Beerman Motion for Fees Playbook. Thereby they completely disregarded the wisdom of Lisa Ruble Murphy ultimately to the detriment of all parties but inuring to the financial benefit of Beermann LLP.

121.    Upon information and belief, Judge Boyd has shared some of the cash payments received from Beermann LLP with Judge Goldfarb wherein Beermann LLP has requested favorable rulings on proceedings before her – including those initiated by Jane Girard. Both judges were compromised. In a seeming admission to taking a payoff, Judge Renee G. Goldfarb entered an order of recusation shortly after the initial pleading hereunder was filed.

122.    Shortly after Enrico J. Maribelli entered his appearance for Jane F. Girard, a number of family law practitioners interviewed by Plaintiffs recounted to Plaintiffs that Enrico's appearance materialized because "he is in with Boyd."

123.    In a shared elevator ride, Enrico J. Mirabelli orally represented to Kenton Girard

---

[16] For this mediation, the recommendation was that Jane F. Girard receive custody of the girls approximately four (4) days per month or approximately a split of 14% - 86% favoring Kenton Girard. As we now know, she disregarded those recommendations and proceeded to pursue sole custody, in other words a split of 100% - 0% favoring herself. By contrast with the mediation which billed approximately $4,000 in total, Jane F. Girard was now pursuing a full-blown high-conflict post-decree proceeding in the court which would of course bring with it a much higher price tag. As an example, just the 604.10(b) custody report later prepared by Phyllis Amabile would run a bill of in excess of $60,000.

that the only way to terminate the proceedings was for Kenton to agree to "full custody of [the minor children Gw and Gr] and to **pay all legal fees incurred by Jane owing to her representation by Beermann LLP**".

124. Mr. Mirabelli later disavowed having such an encounter with Kenton and further disavowed that such terms had to be met in order to terminate the proceedings. In any case, this oral representation to Kenton exposes the essence of how the scheme profits Beermann LLP.

125. At a court date in the underlying family court proceeding on October 18 2024, Mr. Mirabelli confirmed that he intended to bring a motion for fees at the conclusion of the evidentiary hearing set for February 18-21 2025. Additionally, he previously moved for fees under Ill. S. Ct. R. 137, under the theory that the SOJ for Cause directed at Defendant William S. Boyd was unsuccessful. However, it is a fact that Boyd stepped down *as a proximate result of* the Petition for SOJ for Cause.

126. As alluded in the preliminary statement *supra*, as a proximate result of the above-described characteristics, Gw and Gr have been forced to divert much of their attention and time to the goings-on in the underlying family court proceedings for an artificially extended period of time, thereby negatively impacting their growing business. This impact is evidenced by the fact that the girls have been unable to (a) complete their provisional patent application for their new jewelry clasp, (b) complete work with a business expert to prepare a private placement memorandum to subsidize manufacturing and marketing of said jewelry clasp.

127. The dollar magnitude of the damages to White Lemon Creations is substantial because recently an investor associated with Keiretsu Forum assessed their proprietary concept of a new jewelry clasp which converts earrings into necklaces, necklaces into bracelets and so forth as of immense commercial value wherein he estimated that IP alone would be worth

$10-$25 million.

128.     Gw and Gr have not been able to allocate the time to make proper filings to protect this IP and have been unable – again because of having to advocate for their own interests in the proceedings under which the family law functionaries have resigned – to dedicate the time needed to the make horizontal and vertical expansion plans advocated by the investor from Keiretsu Forum.

129.     Furthermore, the community in which Gw and Gr sell their White Lemon Creations wares has stepped away from their offering because the high-conflict proceedings have stigmatized Gw and Gr and hurt their brand name. To wit, on or around May 2024 Gretchen Miller of the Wild Child of Glencoe specifically told Gr that "it is a shame she is not seeing her mom. Your mom came in the other day, you should see her. " Thereby she discontinued selling the White Lemon products at the store.

130.     Huge opportunities to develop the children's White Lemon business await, but Beermann is per their usual playbook opposing everything by implementing high-conflict strategies. Gw and Gr are seeking limited scope emancipation to sign contracts to grow their business, however Beermann LLP is vexatiously opposing same, including via a motion to consolidate the emancipation matter into the family court custody proceeding (wherein the judges are owned by Beermann LLP), which matter is set for a hearing on December 17 2024.

131.     When they sell during Sidewalk Days (third week of June) in Glencoe, for the past two years in which litigation has been pending, people who would have normally patronized White Lemon have avoided the booth due to influence by Jane F. Girard. Whereupon Gw and Gr reached out to some of their historical patrons, certain of those patrons have specifically cited the high drama in their family law proceeding and "do not want to get involved".

132.   Also as previously mentioned, as a proximate result of the grossly elongation and high-conflict nature of the proceedings, Kenton Girard has been forced to divert much of his attention and time to the goings-on in the underlying family court proceedings for an artificially extended period of time, thereby negatively impacting his real estate brokerage side business.

133.   This impact is evidenced by the fact that in the twenty-year history of operating The Girard Brokerage, it has never posted annual revenues of zero before the commencement of the underlying family court proceedings. Indeed, during 2023 and 2024, the business has seen revenues shrink to zero for both calendar years.

134.   In addition, Kenton received an offer with more substantial compensation than his current position from global law firm Kirkland Ellis to manage their entire stack of real estate concerns. However, when the hiring partner learned of the elongated and high-conflict nature of the underlying family court proceedings, the offer was rescinded. Kenton was also damaged in his property by being forced to pay excessive legal fees (that excess being wrongfully sought from him, wherein the playbook is extortionate in nature and violative of the Hobbs Act).

135.   It goes without saying that severe emotional trauma and frustration has been visited on the Plaintiffs collectively, by the sheer elongation and high-conflict nature of the proceedings.

136.   Under Jane F. Girard's assertion of her Fifth Amendment Right under examination by the DCFS and Cook County ASA Mary Stein, she was divested of her right to seek a custody remedy as to Gw and Gr by application of judicial estoppel. As a result, the fact the proceedings move forward has caused poignant mental anguish for the Plaintiffs.

137.    Here, Beermann LLP directed one of the minor children's medical care providers – Dr. Detjen – to fabricate a report of harassment by Kenton Girard to the Kenilworth Police Department[17]. That incident also caused emotional distress and mental anguish for Plaintiffs.

138.    At this time of the second DCFS investigation of Jane F. Girard, upon information and belief Mr. Mirabelli directed outside counsel Kathryn Ciesla Esq from Northfield to deliver a cash payment to Village of Glencoe Detective Ryan McEnerney. She completed the task by meeting McEnerney on his way home from work on or around early August 2023 in the vicinity of Tower Road and Skokie Boulevard on the outskirts of Glencoe – in exchange for his written finding that felony child sex assault charges against Jane F. Girard were "unfounded".

## PARADE OF HARMS BY THE FAMILY LAW FUNCTIONARIES

139.    Vanessa Hammer Esq was appointed guardian ad litem on September 9 2022 by order of Judge Boyd in the Girard family law proceedings with respect to *inter alia* all issues to the motion to appoint parenting coordinator, motion to compel enrollment in therapy, motion to modify parenting time decision-making and other relief.

140.    When the minor children revealed that they had received great interest in their social media postings about their perceptions of being treated unfairly by Beermann LLP, their therapist Gwenn Waldman immediately shared such information with Ms. Hammer, who in turn advocated for shutting down the children's collective voice. Needless to say, patient confidentiality was breached and Ms. Hammer wildly overstepped her mandate. But alas, this is typical of proceedings "owned" by Beermann LLP.

141.    During family court ordered mediation, the mediator suggested the minor children meet with her. During said meeting, the minor children disclosed they had been sexually

---

[17] He did in fact file a report with the Kenilworth Police Department on October 21, 2022 under incident number 2022-000111280.

assaulted by Jane Girard and refused to live with their estranged mother as a result. Beermann LLP then advised Jane to seek her own therapy with Ruth Kraus. Eight months later the Cook County family court ordered the minor children to start seeing Gwenn Waldman, another therapist from Breakthroughs Family Solutions and colleague of Ruth Kraus. Over the Plaintiff's energetic objections as to a conflict of interest, the court ordered the same.

142. After only two counseling sessions, Gwenn Waldman disclosed confidential information from minor child Gr. with Ruth Kraus (also of Breakthroughs Family Solutions) who relayed such information – wrongfully – to Jane Girard.

143. When minor child Gr. became aware of the same and confronted Gwenn Waldman as to this breach of client confidentiality, Gwenn Waldman tried to force minor child Gr. to sign a legal release without the benefit of review by an attorney. Unable to obtain the signature of minor child Gr., Gwenn Waldman then asked Plaintiff Kenton Girard for his signature thereunder, which he also accordingly refused. This conduct was reported in a complaint to the IDFPR lodged by the Plaintiffs.

144. Breanna Traub served as therapist for minor child Gw. Upon information and belief, she also breached client confidentiality and illicitly leaked information acquired during therapy sessions to Jane Girard. Upon information and belief, Beermann LLP orchestrated that illicit information sharing by Breanna Traub. Plaintiffs filed a separate IDFPR complaint against Ms. Traub in fact.

145. Gwenn Waldman were subpoenaed by the Plaintiffs in the family law matter. However, she did not respond to those lawfully issued subpoenas or follow-on motions to compel. Predictably, the judges being "owned" by Beermann LLP, there was no penalty or consequence for their willful and illegal non-compliance with those requests. By contrast, Judge

Boyd dignified every transparent effort to gin up unnecessary legal fees with a briefing schedule. For example, on November 3 2022, he set a briefing schedule for a *Verified Petition for Rule to Show Cause for Adjudication of Indirect Civil Contempt*. He did similarly for other ill-intended "emergency" motions and petitions including various motions to compel compliance.

146. On July 24, 2023, Kenton's attorney Joe O'Brien, also served Vanessa Hammer with a subpoena commanding her appearance at a deposition on August 28, 2023 at 1:00pm and requesting certain documents. The subpoena was properly issued and served in accordance with all applicable rules governing notice and service of process.

147. Vanessa Hammer failed to appear for the August 28 deposition and has further flouted a series of follow-up email messages. Such noncompliance was of zero concern to the family law court: multiple motions to compel inspired no judicial direction or action against Ms. Hammer.

148. The following day, the court signed a **July 25, 2023 Gag Order** providing in pertinent part as follows: "2. Kenton Girard, Petitioner (hereinafter "Kenton") and Marissa Girard, Third Party Respondent (hereinafter referred to as "Marissa"), shall oversee the deletion of all of the minor children's social media postings which relate to this instant litigation/case, including but not limited to postings that relate to this case on: Instagram accounts (including but not limited to ), TikTok accounts, Facebook accounts, and/or any other social media accounts, platforms/and/or web sites. Kenton and Marissa shall oversee that the children delete all such postings within 24 hours of this Court's Order."

149. The **July 25, 2023 Gag Order** further provides: "3. Kenton Girard, Petitioner, and Marissa Girard, Third Party Respondent, shall instruct the minor children, and shall oversee, that neither child shall post any social media postings related to the instant litigation. 4. The

Court finds that the children have a relationship with Kenton and reside solely with Kenton and Marissa (though not via Court Order); as such, Kenton shall inform the children of the appointment of the Child Representative, Joel Levin, prior to the children's first meeting with him. 5. Kenton and Marissa shall oversee and shall instruct the children not to communicate with or be interviewed by any reporters, media personalities, and the like…"

150.    In short, the gag order is obviously unconstitutional and of a First-Amendment-offending nature. What is noteworthy is that Beermann LLP fought hard to put the gag order in place – as they will almost certainly attempt to do when the instant complaint is filed. They were extremely paranoid about social media postings the minor children made which received hundreds of thousands of views, exposing some of the inequities perpetrated against them by Beermann LLP. Fundamentally, Beermann LLP does not want prying eyes into its racketeering activities and its manipulations of family law proceedings in Cook County.

151.    Around the same time, Judge Boyd pronounced that the minor children were "acting like terrorists" and boldly declared that he would not be "bullied by a 15-year-old". As Kenton Girard noted in an interlocutory appeal of the gag order, such inflammatory language indicates preconceived notions that may taint the court's future decisions concerning these children and further erodes trust in the proceedings.

152.    Somewhat incredibly, a petition for substitution of judge for cause filed by Kenton Girard although denied by a third party judge led to Judge Boyd voluntarily stepping aside. However, the excitement died down when the replacement Judge Goldfarb declared upon taking the helm that she "answered to Boyd" and that the trial  would proceed according to Judge Boyd's wishes.

153.    Such a replacement of judge – wherein the replacement is merely following the orders of the judge *replaced for cause* – indeed flies in the face of the correct operation of the 5/2-1001(a)(3). Such a scenario cannot possibly represent what the Illinois General Assembly intended when that statute became law in Illinois.

## OTHER ILLEGAL ACTIVITIES BY JANE F. GIRARD

154.    Jane F. Girard was also sued by Plaintiff Kenton Girard for making illegal recordings. That suit was litigated in the Skokie Courthouse, Second Municipal District in the courtroom of J. Warnick wherein Jane paid a sum to Kenton in settlement of his claims. The underlying allegations amounted to serious criminal wrongdoing punishable by a prison sentence.

155.    In another incident, Jane F. Girard planted an Air Tag on the personal vehicle of Marissa Girard. Indeed, the story received media attention from NBC Chicago, Fox 32 Chicago and … See Apple AirTag found underneath Glencoe woman's car – NBC Chicago, Cook County woman finds Apple AirTag on car after iPhone notification: 'My movements were being tracked' (fox32chicago.com).

156.    Such evidence regarding the illegal recordings and illegal surveillance by Jane F. Girard was tendered to the Glencoe Department of Public Safety via Detective Ryan McEnerney. In spite of clear and convincing evidence of illegal surveillance and emplacement of the Air Tag pointing to Jane Girard, Detective Ryan McEnerney similarly closed that investigation as "unfounded", thereby refusing to request charges from the State's Attorney Office of Cook County[18].

---

[18] It is an unfortunate reality that requests for criminal charges must be typically made by the local police department. As an unintended consequence of the local origination requirement for criminal charging orders, many municipal police departments run their organizations like private fiefdoms with no accountability as to the felony cases which they recommend (or sometimes as her, the felony cases they refuse to recommend) to the State's Attorney Office for prosecution.

157.    Upon information and belief, not only did Ms. Ciesla[19] pay off Detective Ryan McEnerney but she also was behind the unconstitutional gag order of July 25, 2023 which was instituted against the minor children by tattling on the minor children's use of social media (allegedly in a manner prejudicial to Beermann LLP) to the then-guardian ad litem, Vanessa Hammer, who enthusiastically supported prior restraints on their speech.

158.    A number of other residents of Glencoe contacted the Village of Glencoe to explain why they declined to request charges against Jane F. Girard with respect to the Air Tag incidents, the illegal recordings and the sexual assaults of her estranged minor children. Pressure has been building on the Village of Glencoe to the point that Detective McEnerney has sent an unsolicited email message to Marissa Girard on or around July 30 2024 for the express purpose of offering a discussion at the offices of the Department of Public Safety to explain their rationale for not pursuing criminal charges against Jane Girard.

159.    In the weeks leading up to the filing of this original pleading, Marissa Girard has indeed spread word about the intentional and repeated failures to investigate by Detective McEnerney and the Village of Glencoe as to prima facie evidence of criminal wrongdoing. In response, literally dozens of similarly victimized individuals have come forward complaining of mistreatment by Detective McEnerney. Plaintiffs believe supervision of the Department of Public Safety, as sought below, would indeed lead to prosecution of Jane F. Girard.

## **INACTION AND DERELICTION BY THE VILLAGE OF GLENCOE**

160.    The failure of Detective McEnerney to request criminal charges as to the Air Tag incident mirrors his failure/refusal to request child sex charges against Jane Girard.

---

[19] Ms. Ciesla who also moonlights as the President of the Village of Northbrook is a known "fixer" in the North Shore with a reputation for engaging in extrajudicial undertakings on behalf of paying clients vulnerable under proceedings in the family law courts in Cook County and Lake County. By reputation she is often called upon by family law firms to negotiate and deliver illicit payments to judicial officials in the Skokie Courthouse, 2nd Municipal District, to family law functionaries and officials in the North Shore.

161.    Indeed, a similar wrongful emplacement of an air tag to track a woman in Goshen, Connecticut, correctly resulted in the filing of criminal charges against the suspect. See the story as reported by NBC Connecticut: AirTag used to stalk Goshen woman, police say – NBC Connecticut. Competent police – as in Goshen CT – request charges when the evidence is good.

162.    Upon information and belief, the Glencoe Police Department has been called on over one hundred (100) sexual assault cases since 2019 – all in which the victim was a woman or girl – and charges have been filed in less than five of those cases. Recent FOIA requests by Kenton Girard and other residents document this situation. Indeed, reading over FOIA documents produced by the Village of Glencoe in the last four months fills one with a sense of fear for the women and girls who reside in the Village of Glencoe.

163.    Given the pervasiveness, Detective McEnerney not only tolerated but ratified the Department of Public Safety's practice of not diligently investigating sexual assault cases by (a) failing to properly supervise the Department of Public Safety, (b) failing to properly train Department of Public Safety personnel, (c) failing to forward evidence of the criminal acts committed against the minor children Plaintiffs Gw. and Gr. and other female victims of sexual assault for prosecution; (d) failing to ensure forensic evidence of the sexual assault of minor children Gw. and Gr. and other female victims was not ignored; (e) failing to ensure that sexual assaults and rapes that occurred in Glencoe were investigated; (f) failing to ensure evidence of the penetrative sexual assaults of the minor children Gw. and Gr. and the sexual assaults as to other female victims was not lost or mishandled; (g) failing to discipline, restrict or control Department of Public Safety personnel for failing to investigate the sex crimes against the minor children Gw. and Gr. and sexual assaults as to other female victims; and (h) failing to ensure proper recordkeeping of forensic evidence records and documents.

164.     Defendant McEnerney never informed Plaintiffs of the Village of Glencoe's policy, practice and/or custom of systematically failing to investigate rapes and sexual assaults against women and girls.

165.     Defendant McEnerney never informed Plaintiffs that the Department of Public Safety did not conduct any meaningful investigation into the penetrative sexual assaults of the minor children Gw. and Gr.

166.     Defendants McEnerney and Village of Glencoe did not make public its policy, practice and/or custom of failing to investigate rapes and sexual assaults, and Plaintiff has uncovered no evidence that suggests that the Village of Glencoe ever informed any party outside of the Department of Public Safety and the Village of Glencoe as to the Village of Glencoe's policy, practice and/or custom of failing to investigate rapes and sexual assaults.

167.     Through its non-disclosure, Defendants McEnerney and Village of Glencoe ensured that they were the only individuals or entities that had evidence of Village of Glencoe's failure to investigate the penetrative sexual assaults of the minor children Gw. and Gr. by their estranged mother Jane Girard and of the Village of Glencoe's general policy, practice and/or custom (dating back to at least 2019) of not investigating rapes and sexual assaults against women and girls.

168.     Defendant McEnerney and Village of Glencoe's silence and inaction independently prevented anyone outside of Village of Glencoe and the Department of Public Safety from knowing about Village of Glencoe's decision not to investigate the sexual assaults against the minor children Gw. and Gr. and rapes  committed against other women and girls.

169.    Defendant McEnerney and Village of Glencoe's continued failure to investigate the sexual assaults against the minor children Gw. and Gr. harmed and continues to harm Plaintiff.

170.    Since the time of the penetrative sexual assaults against the minor children Gw. and Gr., Defendants' actions have denied and continue to deny Plaintiffs Gw. and Gr. and all sexual assault victims in Village of Glencoe justice for these horrible crimes. Because of Defendants' decision not to conduct an investigation into these sexual assaults of Gw. and Gr. and Defendants' efforts to conceal that decision, Jane Girard has not and will not be tried for committing two separate counts of penetrative sexual assault against her estranged minor children Gw. and Gr.

171.    As a direct result of Village of Glencoe's actions, Plaintiffs have suffered extreme emotional and physiological damage: first from not knowing if or when Jane Girard might commit further sexual assaults against them (which remains likely considering that in the family court matter Jane continue to seek full custody of Gw. and Gr.), and then further damage upon learning of Defendants' deliberate indifference to these outrageous sexual assaults committed.

172.    On or around June 2021, Jane Girard brutally sexually assaulted by penetration her estranged minor child Gw. who was at that time only thirteen (13) years old.

173.    On or around February 2022, she committed the same offense against her other estranged minor child Gr. who was at that time approximately fourteen (14) years old.

174.    Upon information and belief, the manner of both assaults involved Jane Girard forcibly and repeatedly alternatively inserting her fingers and a tampon into the vaginal openings of the minor children Gw. and Gr. Upon information and belief, both of these assaults took place in the residence of Jane Girard at 90 Linden Ave in Glencoe.

175.    As a direct and proximate result of these attacks, the minor children thereafter decided that they felt both uncomfortable and unsafe residing – even part of the time – with their estranged mother. Since August 2022, both minor children Gw. and Gr. have resided full-time with their father Kenton and step-mother Marissa.

176.    Separately, in an apparent continuing pattern of abuse perpetrated by Jane Girard, on or around April 28 2023, minor child Gr. reported to DCFS that on multiple dates she had been locked in the car by her mother, yelled at for over an hour sometimes, and felt trapped. She asked multiple times for her mother to release her so she could go to swim practice and her mother refused.

### MCENERNEY SHUTS DOWN THE CRIMINAL CASES

177.    Detective McEnerney from the Department of Public Safety of the Village of Glencoe opened a separate criminal investigation for each minor child under investigation numbers 23-08604 and 23-08597. The Department of Public Safety is a division of Defendant Village of Glencoe, Illinois.

178.    On July 31 2023, the DCFS spoke with Detective McEnerney. This CPS discussed the interviews with the children, and the children's father. This CPS advised that this CPS discussed the forensic interview process with the father and, after speaking with his children, they decided to proceed with the forensic interview process. This CPS and the detective discussed additional aspects of this investigation and agreed to remain in contact.

179.    The DCFS found the evidence supporting the sexual assaults against the minor children Gw. and Gr. to be so compelling that representative Chundra Brown told Plaintiffs in a visit to their home on or around May 2023 that Jane Girard would be charged for sexual assault.

180.    Upon information and belief, the DCFS was in regular contact with Detective

McEnerney and clearly communicated to him their suggestion that he request the filing of charges with the States Attorney against Jane Girard for the commission of felony child sexual assaults. Upon information and belief, the DCFS communicated that it believed there was probable cause to arrest Jane Girard for these penetrative sexual assaults against her estranged minor children Gw. and Gr.

181.    Upon information and belief, Detective McEnerney completely ignored the charging request from DCFS and instead reached out to Jane Girard in hopes of receiving an illicit payment in exchange for his refusal to request felony charges with the States Attorney.

182.    Upon information and belief, the request from DCFS for the filing of criminal charges was contained in a written document prepared under the supervision of Director Maria Paredes.

183.    Upon information and belief, even in receipt of damning written reports prepared by DCFS at the behest of Maria Paredes, no one at the Village of Glencoe took any affirmative action as to requesting the filing of felony charges against Jane Girard.

184.    Since at least on or around 2019 when Detective McEnerney acquired a significant voice and influence over the Department of Public Safety, the Village of Glencoe has engaged in a policy, practice, and/or custom of failing to investigate sexual assaults and rapes against females.

185.    Defendants McEnerney and Village of Glencoe were responsible for establishing, implementing, and overseeing Village of Glencoe's policy, practice, and/or custom of failing to investigate rapes and sexual assaults against females and/or were responsible for overseeing and training others in the Department of Public Safety in accordance with that policy, practice, and/or custom.

186.    Upon information and belief, since at least 2019, Village of Glencoe's policy, practice, and/or custom has been to not: (a) conduct in-depth follow-up interviews with sexual assault and rape victims, (b) conduct interviews with offenders, (c) act on recommendations by the Illinois State Police or DCFS or other state agencies, or (d) attempt to preserve evidence that could aid in the investigation of rapes and sexual assaults. That policy, practice and/or custom was established, implemented and overseen by Defendants McEnerney and Village of Glencoe.

187.    On August 31 2023, Austin G. Altman from DCFS spoke with Detective McEnerney. Detective McEnerney advised that he would likely be speaking with his supervisor about closing the law enforcement investigation. Shortly thereafter, Detective McEnerney paid a personal visit to Plaintiff's home and announced their investigation was unfounded.

188.    On September 7 2023, the DCFS informed Jane Girard and her attorney – one Ms. Hansen, not affiliated with either Beerman LLP or Kathryn Ciesla – that the charges were "unfounded". Two days later on September 9 2023, DCFS supervisor Maria Paredes declared that "At this time there is insufficient evidence to support the allegation of Sexual Molestation" noting that the reason for her finding was that the "[c]riminal case was closed and unfounded."

189.    In other words, by declaring the criminal investigations of Jane Girard "unfounded", Detective Ryan McEnerney set into motion a nullifying wave not only over the prospect of criminal prosecution but also the involvement of the DCFS with respect to making binding recommendations as to the best interests of the minor children. Incidentally, the Village of Glencoe has treated these allegations against Detective McEnerney as "unfounded". As confirmed by FOIA production requested by Kenton Girard, the Village of Glencoe has egregiously *undertaken no efforts* to investigate the allegations against Detective McEnerney, much less to suspend him or to restrict his duties as the Lead Detective in town, in a departure

with the way allegations are typically handled against police officers in large cities throughout the United States wherein internal investigation must always be performed, and typically during the pendency of same the officer is pulled out of the field from active duty.

### THE GLENCOE CORRUPTION IS PART OF A LARGER PATTERN

190.    This disturbing practice of not properly investigating sexual assaults against women is part of a larger trend nationally. See New York Times article: These Rape Victims Had to Sue to Get the Police to Investigate - The New York Times (nytimes.com).

191.    According to the New York Times, in Austin, where a lawsuit was filed last June, the plaintiffs include a woman who said that the police collected no evidence from the crime scene after a rapist broke into her apartment; a University of Texas student whose screams for help were recorded but whose case was dropped when her attacker, a stranger, claimed the sex had been consensual; and another student who said she was forcibly taken to a motel and raped by three men, one of whom was not arrested even when his DNA was in her sexual assault kit.

192.    According to the New York Times, these lawsuits face an uphill legal battle, with hurdles ranging from the technical, like exceeding the statute of limitations, to the substantive, such as a ruling in Houston that there is no requirement that police investigations be timely. But whatever obstacles the suits face, they present evidence that some law enforcement agencies foster attitudes toward sexual assault victims that make justice unlikely.

193.    In one deposition in an Illinois case, a commander said he believed that half of the reported sexual assault cases in his precinct were false (researchers say the actual incidence of false reports is between 4 and 7 percent). Detectives in San Francisco told a survivor that she should not have been out partying because she weighs less than a man and had her period.

194.    Illinois' Sexual Assault Evidence Submissions Act, which took effect on

September 1, 2010, required all Illinois law enforcement agencies, including without limitation the Village of Glencoe Department of Public Safety, to provide to the Illinois Department of State Police a written inventory of the number of Evidence Kits that had not been submitted to a laboratory for analysis. (720 ILCS 202/20) (2010).

195.    The Sexual Assault Evidence Submissions Act also requires the Department of Public Safety to submit for testing all collected Evidence Kits that are or were at the time of collection "the subject of a criminal investigation." (720 ILCS 202/20). An Evidence Kit should be the subject of a criminal investigation unless it is determined that the Evidence Kit was not taken in connection with a crime—cases in which the alleged victim has recanted, for example.

196.    Defendants' continued failure to investigate the sexual assaults against Gw. and Gr. harmed and continues to harm Plaintiffs.

197.    In addition, as a result of Defendant McEnerney and Village of Glencoe's actions, Plaintiffs suffered extreme emotional and physiological damage: first from not knowing if or when Jane may assault again, and then further damage upon learning of Defendants' deliberate indifference to her documented sexual assaults of the minor children Gw. & Gr.

198.    As the Supreme Court explained under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), a Section 1983 claim does not lie against a municipality solely on the basis of vicarious liability. Instead, the plaintiff must demonstrate that the municipality had an official policy or unofficial practice or custom that was deliberately indifferent to civil rights in general and that violated the plaintiff's civil rights in particular.

199.    To successfully prosecute a Monell claim, a plaintiff must demonstrate "a persistent and widespread practice" that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Diaz v. Miami-Dade County*, No. 20-10245, 2021 U.S.

App. LEXIS 6320, at *8-*9 (11th Cir. March 4 2021) (citations omitted). This standard "prevents the imposition of liability based upon an isolated incident." *Id* at *8 (citation omitted).

200.    Under FRCP 8(a), the pleading requirement for a Monell claim requires (1) a short and plain statement of the grounds for the court's jurisdiction; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought. Such "notice pleading" does not require detailed or specific factual allegations or in pleading special types of claims such as fraud and mistake.

201.    Indeed the Supreme Court has held that a Monell claim is subject to the ordinary rules of notice pleading and does not require detailed or specific factual allegations to survive dismissal. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-169 (1993). Instead, reasoned the court, a better time to scrutinize the facts supporting a Monell claim is during a motion for summary judgment, once discovery has taken place and enabled the parties to gather evidence. *Id*. at 169.

## COUNT I - VIOLATION OF RIGHT TO IMPARTIAL PROCEEDINGS
### *42 U.S.C. § 1983*; *Boyd, Goldfarb*

202.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

203.    By accepting bribes to render specifically requested favorable decisions to Beermann LLP clients, Judges Boyd and Goldfarb cannot claim judicial immunity here.

204.    In 1927, the Supreme Court addressed a claimed violation of the right to an impartial judge. *Tumey v. Ohio*, 273 U.S. 510 (1927) involved a challenge to a conviction in a municipal court in which the mayor presided as the judge, for violation of the state's prohibition law, which resulted in a fine, a fraction of which was allocated to the mayor "in addition to his regular salary." *Tumey*, 273 U.S. at 518–19. The Court held that this improper financial motive violated the defendant's right to an impartial judge.

205.    It is plain that the proceedings instituted by Jane Girard were not impartial: Judges Boyd and Goldfarb had already accepted bribes to render favorable decisions specifically inuring to the benefit of Jane Girard in these proceedings. The refusal by the court to compel subpoena compliance as to Defendants Hammer, Waldman and Amabile juxtaposed with on the other hand approval of virtually all motions filed by Jane Girard demonstrates the lack of impartiality in those proceedings.

206.    Plaintiffs suffered injuries, damages and losses as a result of the violation of and interference with Plaintiffs' constitutionally protected right to an impartial judge including numerous adverse decisions which would not have been rendered by a fair, impartial judge.

## COUNT II - VIOLATION OF FIRST AMENDMENT RIGHTS
### *42 U.S.C. § 1983*; *Boyd, Goldfarb*

207.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

208.    By accepting bribes to render specifically requested favorable decisions to Beermann LLP clients, Judges Boyd and Goldfarb cannot claim judicial immunity here.

209.    The prior restraints in the gag order issued against the minor children Gw. and Gr. constitute an impermissible violation of their First Amendment Rights.

210.    While the Illinois Appellate Court refused to overturn said gag order, it did so under the notion that the gag order was not "injunctive" in nature. The Illinois Appellate Court specifically side-stepped the constitutionality of the gag order.

## COUNT III - NEGLIGENCE
### *Waldman, Traub, Paredes*

211.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

212.    All of the Defendants hereunder, as legal functionaries in family law proceedings, owed a duty of care to Plaintiffs, including a duty to ensure that all materials published on the docket in the family law proceeding instituted by Jane Girard were properly redacted to protect

the minor children's privacy interests and/or to seal the record from public access. In particular, Defendants Waldman and Traub owed the minor children Gw. and Gr. a duty of maintaining therapist-patient confidentiality. Finally Defendant Paredes as the director of the investigations and actions taken by DCFS in response to the felony criminal allegations against Jane Girard had a duty to request the filing of those charges at such point that Defendant Paredes concluded that such charges were justified.

213.    However, no protective orders or other measures were taken to protect or to redact highly sensitive information of the minor children hereunder, notably including explicit details as to the penetrative sexual assaults perpetrated against the minor children Gw. and Gr. with respect to the heinous acts committed by their estranged mother Jane Girard. Defendants Waldman and Traub specifically violated therapist-patient confidentiality by disclosing confidential information to Jane Girard (as to Waldman, via therapist Ruth Kraus also of Breakthroughs Family Solutions) and to Vanessa Hammer. Defendant Paredes reneged on her obligation to request the filing of felony charges against Jane Girard after she had already arrived at the determination that charges were justified, as evidenced by DCFS representative Chundra Brown telling Plaintiffs in May 2023 that sexual assault charges were indicated.

214.    As a result of these breaches of duties, the minor children were grievously harmed: (a) highly sensitive and embarrassing details are sitting on the docket for any member of the public to download, thereby jeopardizing their future careers and lives, (b) an unconscionable and unconstitutional gag order was implemented against all of the Plaintiffs as a result of patient privilege breaches, (c) the Plaintiffs incurred exorbitant and unreasonable fees by having to address these breaches, and (d) because Defendant Paredes refused to perform her job duties, the

minor children have to live in fear of being assaulted again by their estranged mother Jane F. Girard, especially with the likelihood that the custody report will be adopted by the court.

## COUNT IV - RICO (18 U.S.C. § 1962(c))
*Beermann, D'Arco, Quigley, Mirabelli*

215.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

216.     Each Defendants is a "person" under 18 U.S.C. § 1961(3). This is because each Defendant is capable of holding a legal or beneficial interest in property.

217.     Beermann LLP is a business enterprise, and the individual Defendants willingly and knowingly conducted and participated in the firm's affairs through a pattern of racketeering activity that affected interstate commerce.

218.     The Defendants collectively also form an association-in-fact enterprise that includes family law functionaries proposed by Beermann LLP including without limitation:

(a) appointable family law proceeding functionaries child coordinators, custodial evaluators, parental evaluators, child therapists, family reunification therapists, guardians ad litem, and so forth; (b) outside law firms directed to engage in extra-judicial maneuvering to illicitly obtain advantage over opposing parties, and (c) local police departments who are directed – or in some cases provided illicit consideration such as cash payments – to launch criminal investigations and even to recommend criminal charges. The Defendants willingly and knowingly conducted and participated in that association-in-fact enterprise through a pattern of racketeering activity that affected interstate commerce.

219.     The law firm enterprise and the association-in-fact enterprise affect interstate commerce because the enterprise members knowingly and routinely file family law actions in Cook County Illinois against (typically high net worth) defendants/respondents residing in other states for the purpose of extracting settlement and otherwise obtaining recoveries through a

pattern of racketeering activity. Family law actions filed by Beerman LLP specifically mentioned in this complaint include individuals residing in Florida, New York, California and Arizona. The conduct of the enterprises has affected interstate commerce because the enterprise members have obtained tens of millions of dollars (or more) in legal fees from individuals residing in Florida, New York, California and Arizona.

220.    The object of the law firm enterprise and the association-in-fact enterprise was to obtain legal fees, settlements or other shared recoveries – under retainer agreements with contingent recovery provisions – from family law defendants/respondents.

221.    In furtherance of their scheme, the Defendants reasonably foresaw the use of, and did in fact repeatedly use, or cause the use of, interstate mails and wires in furtherance of essential parts of the scheme.

222.    Each of the Defendants intended to obtain or cause the loss of money or property of family law defendants/respondents including the Plaintiffs hereunder by means of illicitly exercising control over family law judges in Cook County who had been bribed under a pattern of racketeering activity.

223.    Each of the Defendants engaged or took part in multiple instances of bribery and violations of the Hobbs Act in knowing furtherance of the enterprises' objectives. Numerous predicate acts of bribery and violations of the Hobbs Act were effectuated by the Defendants in knowing furtherance of the enterprises' objectives are set forth in detail in this complaint. These predicate acts by enterprise members in furtherance of the objectives of the law firm and association-in-fact enterprises span more than five years and were persistent through the entire time period.

224.    The predicate acts of bribery and violations of the Hobbs Act involve the interstate transmission by mail and wire of various communications and documents in furtherance of the objectives of the enterprises, because in each instance a bribe is paid a specifically requested favorable outcome is delivered by the bribed judge and in many cases a specifically requested unfavorable outcome for counterparties residing in California, New York, Florida or Arizona. As to the Hobbs Acts violations they arise through implementation of the Beermann Motion for Fees Playbook which involves principally the vexatious and excessive filing of motions and papers, causing grossly excessive fees to result. Those requested outcomes wherein they are unfavorable to out-of-state counterparties involve the gathering of financial records, tax and accounting statements, testimony and other evidentiary concerns via interstate transmissions as aforedescribed.  Other interstate transmissions commonly include subpoenas mailed to out of state financial institutions and processing thereunder via use of email messaging using the interstate wires as well as discovery mailed to out-of-state parties and processing thereunder via use of email messaging using the interstate wires.

225.    Additional instances of bribery and violations of the Hobbs Act as effectuated by the Defendants that will demonstrate the pervasiveness of the pattern of racketeering activity are in the exclusive knowledge or control of the Defendants, and discovery will reveal these predicate acts.

226.    In addition to bribery and the Hobbs Act violations, each of the Defendants intended to obtain or cause the loss of money or property of family law defendants/respondents by means of exercising illicit control over the presiding Cook County family law judges with the consequent result that outrageous billing of fees would be allowed and contingent recovery be awarded by the compromised judges under a part of the pattern of racketeering activity.

227. The predicate acts of the Defendants were related in that they shared the same or similar purposes, results, participants, victims, methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events, but rather regular and integral steps in furtherance of the Defendants' scheme to illicitly grow their revenue by cementing an un-real (in fact manipulated) record of success before the bribed family law judges in Cook County, Illinois.

228. The predicate acts of the Defendants also were continuous in that they have occurred on a regular basis since at least 2019, affected numerous family law matters, and upon information and belief, remain ongoing as to other pending and planned family law matters.

229. There is a significant threat – and Plaintiffs fully expect – that the pattern of racketeering activity of the Defendants will continue into the future, even within the confines of the Girard family law proceeding. All proceedings are opportunities to charge as exorbitant of legal fees as possible. Furthermore, Beermann has many active family law matters, and continues to file and prepare new family law matters.

230. The Defendants' predicate acts of bribery constitute a pattern of racketeering for purposes of 18 U.S.C. §§ 1961(5) and 1962(c).

231. By reason of the Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in its business and/or property in an amount to be proven at trial.

232. Specifically, the Defendants' violation of 18 U.S.C. § 1962(c) has proximately caused Plaintiffs to expend substantial money and resources to defend claims, motions, emergency petitions and all manner of unnecessary procedural developments all permitted to develop under rigged judicial proceedings due to the Defendants' pattern of racketeering activity.

234.    By reason of this violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to treble damages, attorney fees, costs, and interest on all of the foregoing.

## COUNT V - RICO (18 U.S.C. § 1962(d))
*Beermann, D'Arco, Quigley, Mirabelli*

235.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

236.    Beginning on or before 2019, and continuing through the date of this complaint, the Defendants knowingly and unlawfully conspired and agreed with each other to conduct the affairs of the enterprises described above through a pattern of racketeering activity that involved bribery and violations of the Hobbs Act.

237.    At all relevant times, each conspirator knew of and participated in this scheme through specific overt acts intended to further its objective of maximizing firm revenues at the expense of Domestic Relations counterparties.

238.    The Defendants knew about and agreed to the commissions of two or more predicate acts as part of the RICO conspiracy.

239.    The Defendants conspired to unlawfully collect excessive payments from Plaintiffs via bribed judges presiding over manipulated proceedings ordering payments of attorneys fees for Beermanm LLP clients and otherwise cause them to spend money.

240.    By reason of the Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in its business and/or property in an amount to be proven at trial.

241.    By reason of the Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs are entitled to treble damages, attorney fees, costs, and interest on all of them.

## COUNT VI - UNJUST ENRICHMENT
*Beermann*

242.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

243.    The Defendants unjustly received a benefit from Plaintiffs by forcing Plaintiff to endure rigged judicial proceedings before family law judges which had been previously bribed. That benefit came in the form of legal fees and recoveries inflated by the rigged nature of the proceedings.

244.    The Defendants have unjustly retained that benefit to the detriment of Plaintiffs.

245.    The retention of the benefit that Plaintiffs conferred on the Defendants as a result of their unjust conduct violates fundamental principles of justice, equity, and good conscience.

246.    The Defendants are aware of and appreciate the benefits bestowed on them by Plaintiffs.

247.    The Defendants should be compelled to disgorge to Plaintiffs all unlawful and inequitable proceeds they received from Plaintiffs.

### COUNT VII - CIVIL CONSPIRACY
*Beermann, D'Arco, Quigley, Mirabelli, Ciesla, McEnerney, Boyd, Goldfarb*

248.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

249.    As particularly described above, the Defendants had a meeting of the minds on a common object to be accomplished and an agreement to commit wrongful acts to that end. Specifically, the Defendants knowingly and unlawfully conspired and agreed with each other to commit bribery to obtain inflated revenues in the course of rigged judicial proceedings from family law defendants including Plaintiffs.

250.    The Defendants committed various unlawful and wrongful acts as more particularly described above to extract payments and other recoveries from Plaintiffs and otherwise cause Plaintiffs to spend money.

251.    The Defendants were aware of each other's plans to commit the wrongful acts described in this complaint.

252.     Consistent with their agreement, the Defendants intended that the wrongful acts be committed.

253.     As a proximate result of the conspirators' civil conspiracy, Plaintiffs suffered compensatory damages in an amount to be proven at trial, which exceeds $100,000, exclusive of interests and costs.

## COUNT VIII - VIOLATION OF EQUAL PROTECTION CLAUSE
### *42 U.S.C. § 1983*; *Village of Glencoe, Detective McEnerney*

254.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

255.     At all relevant times herein, Defendants McEnerney and Village of Glencoe and its Department of Public Safety acted under color of state law.

256.     At all relevant times hereto, all of the victims of rape or sexual assault reported to the Department of Public Safety were women or girls.

257.     At all relevant times hereto, Defendants McEnerney and Village of Glencoe followed an unwritten and ongoing policy or custom (established, implemented, overseen, and perpetuated by Defendant McEnerney and other individuals from the Department of Public Safety) of responding differently and affording less protection to victims of rape and sexual assault, who were exclusively female in Village to Glencoe, than to victims of other crimes. Upon information and belief resulting from Plaintiffs' investigation, Village of Glencoe's custom, policy and/or practice was to not investigate rape, of which all the victims were women and girls, as thoroughly as it did other crimes. For other crimes, Defendant McEnerney and other officers would interview witnesses, put together police reports and collect evidence. Based upon publicly available reports, these basic investigative steps were not taken for rape and sexual assault cases as a matter of course. The fact that Defendant McEnerney and Village of Glencoe systematically investigated other crimes more thoroughly is evidence of its custom, policy and/or

practice to give female rape victims less protection than victims of other crimes. Since at least 2019, Defendant McEnerney and his Department of Public Safety simply did not investigate rape and sexual assault cases.

258.    Based upon the pervasiveness of the practices and other facts described herein, at all relevant times, Defendants knew that female victim of rape and sexual assault had typically provided forensic evidence to the Department of Public safety, but that as a custom and practice, the Department of Public Safety was not taking steps to reasonably investigate the allegations. Further, on information and belief, Defendants' failure to investigate rape and sexual assault cases was not oversight, but a conscious choice not to investigate or pursue rape and sexual assault cases. Even in situations in which a rape victim provided the name of her rapist and submitted herself to the taking of forensic evidence, Village of Glencoe did nothing. In other words, even for rapes that required no investigation, for which all Defendants had to do was request the States Attorney to file criminal charges, Defendants' standard operating procedure was to do nothing.

259.    Based upon the facts alleged herein, the only logical conclusions that can be reached are that Village of Glencoe's policy of discriminating against victims of rape adversely affects women and girls, and further, that Defendants adopted the policy of not investigating rape crimes because of its adverse impact on women and girls, like Plaintiffs. There is no other plausible explanation— except for an animus towards women and girls—as to why the only crime for which 100% of the victims are female was and is systematically investigated less (by not being investigated at all) than other crimes for which women and girls did not entirely comprise the victim population.

260.    Defendants' systematic disregard of its duty toward its rape victims cannot plausibly be explained as merely the uneven allocation of police resources, because the impact of that conduct exclusively harmed women and girls. Instead, Defendants' approach to rape cases must be construed as the selective, intentional withdrawal of police protection for rape victims on account of their sex.

261.    In furtherance of its unconstitutional policy, Defendants, with deliberate indifference, failed to train its police officers as to the rights of female victims of rape with whom the police came into contact, including but not limited to Plaintiffs.

262.    Defendants' deliberate indifference and willful and wanton conduct created a danger of an increased risk of harm to female victims of rape, including Plaintiff, by failing to investigate rape crimes.

263.    Village of Glencoe's policies identified herein have no rational basis and do not bear a substantial relationship to any important governmental objective.

264.    Defendants followed its discriminatory policy, practice, and/or custom in connection with Plaintiffs rape. In doing so, Defendants violated Plaintiffs' constitutional rights.

265.    Based upon the preceding factual allegations, Defendants were at all relevant times aware that the Department's investigation of rape and sexual assault cases was essentially non-existent and was materially worse than its efforts to investigate other crimes. Moreover, Defendants knew that this fact had a disparate impact on women and girls as all rape victims were female. In the face of this knowledge. Defendants took no steps to rectify this disparity. Consequently, it must be concluded that not only were Defendants conscious of the disparate treatment and its impact on women and girls, but Defendants also knowingly decided not to rectify the problem. The only logical explanation for Defendants' failure to take any steps to

alleviate the harm being done to rape victims, like Plaintiff, is that Defendants' failure was intentional and was motivated by Plaintiffs' sex and the sex of the other rape victims.

266.    Plaintiffs injuries are the result of Village of Glencoe's unconstitutional, discriminatory municipal policy or custom, and/or practice.

267.    As described above, the constitutional injury Defendants inflicted on Plaintiff was caused by persons with final policymaking authority for the Village of Glencoe.

268.    The above described conduct of the Village of Glencoe and Defendant McEnerg[constitutes a violation of 42 U.S.C. § 1983 as Defendants' conduct deprived Plaintiff of her rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

269.    Plaintiffs are entitled to compensatory damages and other non-pecuniary relief.

<u>**COUNT IX - INJUNCTIVE RELIEF**</u>
*Village of Glencoe, Detective McEnerney*

270.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

271.    The minor children Gw. and Gr. continue to reside with their father in Glencoe and may be even soon ordered to reside in the home of their estranged mother at 90 Linden Avenue in Glencoe. Consequently, because Plaintiffs are girls, they are at ongoing risk of the Department of Public Safety ignoring and failing to investigate additional sexual assaults that may be committed against them in the Village of Glencoe.

272.    Plaintiff is entitled to injunctive relief mandating that the Village of Glencoe meaningfully investigate rape and sexual assault cases involving female victims.

273.    In order to seek help from Village of Glencoe, rape victims, like minor children Gw. and Gr., must undertake— immediately after being raped—an emotionally scarring process

whereby they subject their bodies to invasive and intrusive medical procedures in order to collect forensic evidence.

274.    Plaintiffs and other similarly situated women and girls who report their rapes or sexual assaults to the Department are required to relive the rape or sexual assault by telling Department personnel what happened.

275.    These have been and continue to be painful, traumatic experiences for Plaintiffs and similarly situated female rape or sexual assault victims, and the reason Plaintiffs and these other women and girls undertake these steps is to help the Department meaningfully investigate their rapes or sexual assaults and hopefully bring the perpetrators to justice.

276.    Instead, Village of Glencoe engages in a policy, practice, and/or custom of failing to investigate rape cases. As part of that policy, practice, and/or custom, Village of Glencoe, through the Department and the Individual Defendants, ignores the charging requests from DCFS and other state agencies ignores forensic evidence, fails to follow up on the testing of forensic evidence, and ignores the statements of victims, like Plaintiff. In doing so, the Village of Glencoe effectively victimizes rape and sexual assault victims, including the minor children Gw. and Gr., for a second time, as they subject themselves to invasive and traumatic physical and verbal examinations with no chance that such treatment will result in justice.

277. Without the intervention of this Court, neither Plaintiffs nor other female rape and sexual assault victims can stop Village of Glencoe from continuing its violations of equal protection.

278.  Consequently, Plaintiff seeks injunctive relief requiring Village of Glencoe to cease the equal protection violations and other violations it is and has been committing against female rape and sexual assault victims since at least 2019, and to establish and disseminate policies and

procedures that ensure that allegations of rape and sexual assault are diligently investigated. These policies and procedures should include: 1) training members of the Department of Public Safety in how to properly investigate rape and sexual assault cases; 2) sending forensic evidence to labs for preliminary testing; 3) drafting police reports pertaining to forensic evidence; 4) conducting interviews with potential offenders where they are identified; 5) reviewing the lab results of forensic evidence, and conducting follow-up when appropriate; 6) conducting follow-up interviews with rape victims; 7) preserving investigation evidence; and 8) reporting all rape and sexual assault cases to the Cook County State's Attorney's Office. In addition, the Court should appoint a Receiver, Monitor or Special Master to ensure these required changes are implemented.

WHEREFORE, Plaintiff prays this Court grant the following relief:

1) Compensatory damages in an amount to be determined at trial;

2) Trebled damages attributable to the RICO claims, as permitted by 18 U.S.C. § 1964;

3) Disgorgement to the benefit of Plaintiffs of the benefits received by Defendant Beermann unjustly;

4) Attorneys fees, costs, and pre- and post- judgment interest;

5) Injunctive relief prohibiting Beerman from continuing to operate its family law practice in Cook County, Illinois;

6) Injunctive relief requiring The Village of Glencoe to meaningfully investigate rape and sexual assault;

7) The appointment of a Receiver, Monitor, or Special Master to oversee the operations of the Village of Glencoe Department of Public Safety;

8) Nominal damages for the numerous articulated violations of various of Plaintiffs' constitutionally protected rights;

9) Punitive damages where appropriate against the Defendants on all counts in which they are implicated;

10) Such other relief that this Court may deem just, equitable and proper.

Dated: December 6, 2024                                    Respectfully Submitted,

*for Plaintiff Kenton Girard:*                    *for Plaintiffs/minor children Gw and Gr:*

Kenton Girard, *In Pro Se*                        Toma Makedonski, Esq.
/s/ Kenton Girard                                 /s/ Toma Makedonski
965 Forestway Drive                               1271 Old Mill Ct
Glencoe, IL 60022                                 Naperville, IL 60564
Email: kg5252@yahoo.com                           Email: legaltma@gmail.com
Tel: 773-575-7035                                 Tel: 773-727-5491